[Civ. No. 57520. Second Dist., Div. One. July 17, 1980.]

PITNEY-BOWES, INC., Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

308

COUNSEL

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, Douglas B. Noble, Deputy Attorney General, John A. Larson, County Counsel, and William D. Ross, Deputy County Counsel, for Defendants and Appellants.

Paul, Hastings, Janofsky & Walker, Donald A. Daucher and Steven C. Kenninger for Plaintiff and Respondent.

OPINION

**HANSON (Thaxton), J.—**

BACKGROUND

Plaintiff/respondent Pitney-Bowes, Inc. (hereinafter plaintiff and/or Pitney-Bowes) since 1935 has been engaged in business in California of manufacturing, selling and servicing business equipment, including specialized scales designed and used for computing transportation and delivery charges for letters, packages, parcels and other items. As of April 1978 Pitney-Bowes had approximately 31,438 scale customers in California using 39,606 of their scales, about 28,415 of which were sold to customers within 9 years preceding the trial of this case. Plaintiff also employs 337 service representatives in California to service the scales which it sells, either on a call-for-service basis or pursuant to an equipment maintenance agreement.

In March 1975 there was a meeting between legal counsel for plaintiff Pitney-Bowes and general counsel for defendant/appellant State of California Department of Food and Agriculture (hereinafter the State) regarding the applicability or nonapplicability of California's weights and measures legislation embodied in Business and Professions Code sections 12001 through 12540 (hereinafter section 12001 et seq. or the regulatory scheme or the statute)[1] to Pitney-Bowes' scales and scale repairmen.

---

[1]Once it has been determined that a weighing device falls within the regulatory scheme a number of onerous burdens befall a seller, user or servicer of such devices, such as model approval; presale sealing except for "non-portable" scales; notification of sale, installation and repair or adjustment; in-use inspection and testing; registration and regulation of device repairing; and certification of test weights.

In June 1975 counsel for Pitney-Bowes and the State exchanged letters setting forth their respective legal positions concerning the applicability of the regulatory scheme to Pitney-Bowes' scales and scale repairmen. Thereafter, the State in a letter dated June 16, 1975, addressed to Pitney-Bowes' counsel ruled that plaintiff's scales were subject to the regulatory and licensing scheme contained in section 12001 et seq. which includes model approval, installation testing and sealing procedures, and licensing of their repairmen. Defendant State further told plaintiff to advise all former and future customers, except for Pitney-Bowes' scales sold to and used *exclusively* by post offices, to arrange to have their scales sealed. The State also told plaintiff that the foregoing advisements would not deter criminal prosecution or civil actions based on violations of the regulatory scheme but sought Pitney-Bowes' compliance with the laws "as soon as possible, hopefully within 30 days."

In August 1975 Pitney-Bowes, threatened with criminal prosecutions and civil actions, filed a complaint in the superior court seeking declaratory relief and an injunction naming as defendants the State and the County of Los Angeles Department of Weights and Measures (hereinafter the County) which is involved with enforcing certain aspects of the regulatory scheme.

In February 1979 following a hotly contested nonjury trial, the superior court granted the relief sought by plaintiff declaring that the regulatory and licensing scheme embodied in section 12001 et seq. does not apply to plaintiff Pitney-Bowes' scales or scale repairmen and enjoined defendants from enforcing the statute against plaintiff herein.

Defendants State and County appeal from the above judgment.

## FACTS

The following brief summary of the extensive, *unchallenged* findings of fact made by the trial court is adequate for the purposes of this appeal:

Plaintiff Pitney-Bowes, a Delaware corporation with principal offices in Connecticut, sells and services three types of scales in California which are specially designed for the particular purpose of computing

postage and parcel transportation and delivery charges for the United States Postal Service (hereinafter the USPS) and the United Parcel Service (hereinafter UPS) and parcel delivery services other than USPS and UPS. Customers of the foregoing services also use the scales for computing transportation and delivery charges for items prior to turning them over to delivery services.

Two types of plaintiff's scales (a balance-beam type scale [model 4916] and a fan-type scale) are equipped with USPS rate charts and are capable of weighing items to compute delivery charges but are not equipped with UPS rate charts. The third type of scale (a parcel scale with optical display) is equipped with both USPS and UPS rate charts.

USPS has the final authority for determining the adequacy of postal charges, has the prerogative to reweigh a letter or package, and has at least four different programs in operation to test the adequacy of postal charges. In those cases where the charge is not checked or verified by USPS, the computation made by the customer establishes the delivery charge. If USPS discovers an overpayment of postal charges by a customer, the decision of whether to make a refund to the customer is made in the local postal office.

UPS, a common carrier operating in 35 states including California and the District of Columbia, is engaged in the business of picking up and delivering small parcels, and also has the prerogative to reweigh a package which has been weighed by one of its customers and has final authority for determining the adequacy of its parcel delivery charges. UPS also has programs and audit procedures in existence designed to check the accuracy of charges paid by customers and to spot check the weights of packages in order to determine that rates are charged strictly in accordance with approved tariff schedules. When a customer of UPS weighs a package on one of plaintiff's scales, the computation made by the customer establishes the amount paid by the customer in those cases where the charge is not checked or verified by UPS.

(The record shows that USPS is an agency of the United States government delegated the responsibility for making the final determination of the accuracy of postage charges and that UPS, being a common carrier, is regulated by another agency of the United States government, the Interstate Commerce Commission [ICC] which determines UPS' interstate rates and charges and by the California Public Utilities

Commission [PUC] which determines UPS' intrastate rates and charges.)

The scales are designed and intended by plaintiff to be kept at a "fixed location" as that term is used in section 12510, subdivision (d), and as previously noted, plaintiff employs 337 service representatives in California to service its scales, either on a call-for-service basis or pursuant to an equipment maintenance agreement.

There is no evidence that plaintiff's scales are being used for any purpose other than for the particular purpose for which they were designed and intended as hereinbefore described. There is also no question about the fact, nor do defendants contend otherwise, (1) that plaintiff Pitney-Bowes' scales are specially designed, equipped and used to compute the charge for a *service*, namely, that of transporting and delivering letters, packages and other items, and (2) that when an item is weighed on any type of plaintiff's scales, no purchase or sale price for the item weighed is determined.

## ISSUES

The umbrella issue on appeal is whether or not the trial court erred in concluding that plaintiff Pitney-Bowes' scales and repairmen are not subject to the regulatory and licensing scheme contained in section 12001 et seq.

However, the parties agree that resolution of the above issue turns on dual core issues, namely, (1) whether or not plaintiff's scales are used for "commercial purposes" within the meaning of the statute, and (2) whether or not the word "commodities" employed in the statute was intended to include "services."[2]

Defendants State and County contend that plaintiff's scales are used for "commercial purposes" and that the term "commodities" includes a "service"; that the terms are not explicitly defined in the statute and are

---

[2]A weighing device can be used for either a commercial or a noncommercial purpose. Only commercial devices must comply with the regulatory scheme.

Even a cursory inspection of the statute would disclose that an interpretation of the words "commercial" and "commodities" is central to resolution of the umbrella issue since throughout the statute it is made clear that *only* scales and weighing devices used for "commercial purposes" and for weighing "commodities" are subject to the regulatory and licensing provisions of the statute.

ambiguous and unclear; and that this court should construe them very broadly as did defendant State, the administrative agency empowered by statute to enforce the regulations.[3]

Plaintiff Pitney-Bowes asserts that its scales are not used for "commercial purposes," that "service" is not included in the term "commodities" and that the terms in the full context of the statute are in no way ambiguous or unclear. It argues that the trial court correctly construed the legislative intent as exempting its scales and repairmen from the requirements of the regulatory scheme since its scales are designed and used only for the purpose of computing the charge for a delivery "service" and not for computing the cost for tangible goods.

## DISCUSSION

It is our duty in construing the statute in question (§ 12001 et seq.) to ascertain the intent of the Legislature so as to effectuate the purpose of the law and in a fashion which is in harmony with the whole system of law of which it is a part. We must give significance to every word, phrase, sentence and part of the statute in pursuance of the legislative purpose, but must not sacrifice the purpose to a literal construction of any part of the statute. (See *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 732-733 [114 Cal.Rptr. 460, 523 P.2d 260]; *Eckl* v. *Davis* (1975) 51 Cal.App.3d 831, 848-849 [124 Cal.Rptr. 685]; *People* v. *Taylor* (1975) 46 Cal.App.3d 513, 531 [120 Cal.Rptr. 762]; *Anaheim Union Water Co.* v. *Franchise Tax Bd.* (1972) 26 Cal.App.3d 95, 105-106 [102 Cal.Rptr. 692].)

In addition, "Statutes must be construed in a reasonable and commonsense manner, not in a manner that would lead to absurd consequences. The rule is well established that '"where the language of a statute is reasonably susceptible of two constructions, one of which in application will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd

---

[3]As previously indicated defendants State and County do not claim jurisdiction over scales used exclusively by USPS in its postal offices, but do claim jurisdiction over scales used by customers of USPS as well as by UPS, other parcel services and their customers.

consequences, the former construction will be adopted."" (*City of L.A. v. Pac. Tel. & Tel. Co.* (1958) 164 Cal.App.2d 253, 256-257 [330 P.2d 888]; see also, *DeCelle* v. *City of Alameda* (1960) 186 Cal.App.2d 574, 582 [9 Cal.Rptr. 549].) . . .

"""Statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity." (45 Cal.Jur. 2d 625-626.) "[I]n construing a statute the courts may consider the consequences that might flow from a particular interpretation. They will construe the statute with a view to promoting rather than to defeating its general purpose and the policy behind it." (*Id.*, p. 631.) . . ."" (*Anaheim Union Water Co.* v. *Franchise Tax Bd., supra,* 26 Cal. App.3d at p. 105.)

■ Applying the above fundamental rules of statutory construction, we conclude: (1) That the California Legislature at the time of drafting and enacting the scale regulatory and licensing scheme contained in section 12001 et seq. was fully aware of the widespread use of weighing devices by the large "service" industry for the purpose of computing "postage" and "freight" charges for transportation and delivery of letters, packages, parcels and other items; (2) that the state Legislature in clear and unambiguous terms in the statute said what it meant to say; and (3) that its intended primary purpose for enacting the statute was to regulate only those weighing devices used in determining the cost of tangible goods (commodities) "for sale, hire or reward" and that the regulations were not intended to apply to scales specially designed and used for computing charges for the "service" of transporting and delivering letters, parcels, packages or other items.

We, therefore, hold that the court below did not err in finding that the regulatory and licensing scheme contained in section 12001 et seq. is inapplicable to Pitney-Bowes' scales and scale repairmen and in granting the declaratory and injunctive relief sought. Our reasoning follows:

Sections 12210, subdivision (a), and 12500, subdivision (c), are key sections since they, when considered separately and in conjunction with other portions of the statute, are definitional in character and instructive in determining the intended meaning of the terms "commercial"

and "commodities" in the statute and whether or not the scope of the latter term was intended to include "service(s)."

We first focus on section 12210, subdivision (a), which pertains to the inspection of scales. In relevant part this subdivision refers to scales sold or used "in proving the size, quantity, extent, area, weight or measurement of quantities, *things*, produce, articles for distribution or consumption, purchased, or offered or submitted by such person or persons for *sale, hire or reward....*" (Italics added.)

The conspicuous absence of the word "service" from the language of section 12210, subdivision (a), is of significance. The Legislature was certainly aware of the word "service" and its meaning and intended to use it separately and distinctly from the word "commodity" since it included both words in section 12510, subdivision (d), in the following manner: Any person is guilty of a misdemeanor who "[u]ses in the buying or selling of any commodity,[4] *or for determining the charge for a service,*[5] any weight or measure or weighing or measuring instrument which is not kept at a fixed location,..." which does not bear a seal. (Italics added.)[6]

Moreover, the Legislature was surely aware of the clause *"or in computing any basic charge or payment for services rendered on the basis*

[4]Black's Law Dictionary (5th ed. 1979) states the term "commodities" refers "to those *things* which are useful or serviceable, particularly articles of merchandise movable in trade. Goods, wares and merchandise of any kind; movables; articles of trade or commerce. *Movable articles of value*; *things that are bought and sold*." (P. 248, col. 2, italics added.)

Webster's Third New International Dictionary (unabridged 1961) defines "commodity" in the commercial sense as: "1...(c) something used or valued esp. when regarded as an *article* of commerce...2a: *an economic good*; esp. a *product* of agriculture, mining *or, sometimes manufacture as distinguished from services*...b: *an article of commerce*, esp. *one delivered to a transportation company for shipment* 3 obs: *a parcel or quantity of goods*..." (*Id.*, at p. 458, italics added.)

[5]Black's Law Dictionary, *supra*, refers to the word "service" in the context of contract law as meaning "Duty or labor to be rendered by one person to another;...the performance of labor or benefit of another, or at another's command." (P. 1227, col. 1.)

[6]Section 12510, subdivision (d), was probably directed at vendors using portable scales such as strawberry pickers. (See 54 Ops.Cal.Atty.Gen. 141 (1971).)

This section does not apply to plaintiff Pitney-Bowes even though it refers to scales used to determine the charge for a service because it specifically exempts scales kept at a fixed location and defendants concede that plaintiff's scales are designed and intended to be kept and used at a "fixed location."

*of weight or measure*"[7] which it could have inserted after the words "or reward" in section 12210, subdivision (a), if it had intended to include services within the scope of the section.

Of importance also is the fact that the Legislature in section 12210, subdivision (b), provided a different procedure for *"non-commercial"* measuring devices. The procedure does not include affirmative regulatory action by defendant administrative agencies and only comes into play when initiated "upon the written request of any person, firm or corporation." Since subdivision (b) provides a different procedure for "non-commercial" weighing devices, it is reasonable to conclude the Legislature intended subdivision (a) of section 12210 to be definitional of what constitutes "commercial" devices subject to the regulatory provisions of the statute.

Applying the facts of the case at bench to the language of section 12210, subdivision (a), as construed, it is clear that plaintiff's scales are not subject to the regulatory aspects of the statute. Plaintiff's scales are used only to compute the charge for a "service," namely the service of transporting and delivering packages or other tangible items. The packages weighed on plaintiff's scales are neither purchased nor sold, nor offered for hire or reward within the meaning of section 12210, subdivision (a). The packages or items offered to either USPS or UPS or other such services and their customers are for transportation and delivery only. No purchase or sale price, or compensation for the hire, of the package or item itself is determined and no reward is involved.

We turn now to section 12500, subdivision (c), which is the other provision in the statute which throws light on the Legislature's intended meaning of the term "commercial." This section provides: "Weights or measures or weighing, measuring, or counting instruments for sale or

---

[7]The National Bureau of Standards Handbook 44, "Specifications, Tolerances and Other Technical Requirements for Commercial Weighing and Measuring Devices," under General Code section G-A.1(a) and the Model State Registration of Servicemen and Service Agencies Regulation published by the United States Department of Commerce in 1966, section 2.3, both contain language identical to section 12210, subdivision (a), except they do include the magic words referred to. It is reasonable to assume that the drafters and enacters of section 12210, subdivision (a), were aware of the above publications and deliberately intended to omit the clause and exempt scales used by the service industry to compute transportation and delivery charges from the onerous burdens of the regulatory scheme.

use for *commercial*[8] *purposes* shall include devices which are *used at the time of, or for the purpose of,* the *trading in, exchanging, selling, or purchasing of commodities* but shall not include such devices when for use or operation solely within a plant or business as a part of the manufacturing, processing or preparing for market of commodities." (Italics added.)

Defendants argue that section 12500, subdivision (c), is not definitional because it employs the words "shall include" rather than the word "means" after the words "commercial purposes" and point to section 12500, subdivisions (a), (b) and (d), where in each instance the word being defined is followed by the word "means."

Defendants' construction is strained and faulty because such interpretation would not be in harmony with other portions of the statute. While the word "includes" may be used as either a word of enlargement or of limitation, in making that determination the comprehensiveness of the language following the word "includes" is of vital importance. Here, the language following the word "includes" is specific and detailed. (See *In re Martinez* (1942) 56 Cal.App.2d 473 [132 P.2d 901]; *Coast Oyster Co.* v. *Perluss* (1963) 218 Cal.App.2d 492 [32 Cal.Rptr. 740].) In addition, the obvious purpose of the section is to specify *which* weighing devices are to be regulated by the statute. We conclude the Legislature intended to use the words "shall include" to limit the *scope* of the regulatory scheme to scales used in buying and selling tangible goods (commodities). To conclude otherwise would make no sense considering the language of the entire statute and would not be consistent and in harmony with the purpose of the law and the overall regulatory scheme.

In any event, here again (as in our previous discussion of § 12510, subd. (d)), plaintiff's scales are expressly exempted in section 12500, subdivision (c) from the burdens of the regulatory scheme since its scales are typically used solely within plants or businesses as part of the distribution process in preparing their product (commodities) for shipment to their customers or to the market place.

In section 12500, subdivision (c), the word "commodities" is also a key word. As previously discussed, the Legislature obviously knew the

---

[8]Black's Law Dictionary, *supra*, states that the word "commercial" in its generic sense refers in "*most all aspects* [to the] *buying and selling* [of things ("commodities")]." (P. 245, col. 1, italics added.)

difference between "commodities" and "services" and when it meant to include "services," it said so. Examples of this, other than those already mentioned, can be found in sections 12024 and 12024.1 which are nearly identical in purpose and effect but not in subject matter, one section dealing with "commodities" and the other with "services."

Section 12024 provides: "Every person, who by himself, or through or for another, sells any commodity in less quantity than he represents it to be is·guilty of a misdemeanor."

Section 12024.1 provides: "Every person, by himself, or through or for another, who willfully misrepresents a charge for service rendered on the basis of weight, time, measure, or count is guilty of a misdemeanor."

Although sections 12024 and 12024.1 were drafted to meet different problems, it is clear from their inclusion in the statute that the words "commodities" and "services" as used in the regulatory scheme are not synonymous. To conclude otherwise would make sections 12024 and 12024.1 unintelligible.

Plaintiff Pitney-Bowes points to the fact that in June of 1975, the same month defendant State sent its ruling to plaintiff as hereinbefore described, it (defendant State) offered to the Legislature a proposed amendment to section 12510 (which defines the penalty for using incorrect commercial weighing or measuring devices) which would have expanded the scope of that section to include scales used to determine a "service" charge. The proposed amendment to section 12510 (Assem. Bill No. 1711) sought to add the following italicized clause to the existing language: "Any person, who by himself, or through or for another, does any of the following is guilty of a misdemeanor:

"(a) Uses, in the buying or selling of any commodity, *or for determining the charge for a service*, or retains in his possession an incorrect weight or measure or weighing or measuring instrument...."

Following strenuous opposition by the "service" industry, in February of 1976 the proposed amendment to section 12510 described above was stricken in its entirety from Assembly Bill No. 1711. Plaintiff argues that the history of the proposed amendment and other evidence shows that the existing regulatory scheme did not and does not include scales

used to estimate the charge for a "service" unless the Legislature specifically says "or for determining the charge for a service."

Defendants argue that the legislative history surrounding the demise of defendant State's proposed amendment (unpassed bill) to section 12510, subdivision (a), has little value as evidence of legislative intent concerning the regulatory scheme contained in the original (existing) statute since "unpassed bills of later legislative sessions evoke conflicting inferences" citing *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41 [69 Cal.Rptr. 480].

We have no quarrel with the latter proposition and merely view defendant State's attempt to amend section 12510, subdivision (a), as described above as little more than an admission of the shakiness of its interpretation of the existing law. Our conclusions expressed herein are arrived at independently of the legislative papers bearing on the rejection of the proposed amendment. We cannot, however, ignore the fact that the opinions expressed in four separate documents concerning the proposed amendment are in complete accord with our interpretation of the original (existing) statute.[9]

As previously indicated plaintiff Pitney-Bowes has plants and/or operations in many states, including California. USPS is an agency of the United States government delegated the responsibility for making the final determination of the accuracy of postage. UPS is a common carrier operating in more than 35 states and the District of Columbia and is regulated by another agency of the United States government, the ICC which determines UPS' interstate rates and charges and by the PUC which determines UPS' intrastate rates and charges. Each of the two latter agencies has the responsibility for insuring that UPS does not overcharge its customers. Both USPS and UPS have programs designed to check the accuracy of charges paid by their customers and to spot check the weight of packages in order to determine that rates are charged strictly in accordance with approved tariff schedules. In no

---

[9]The Legislative Counsel's analysis contained in his Digest of Assembly Bill No. 1711; the Assembly Finance, Insurance and Commerce Committee analysis; the Assembly Office of Research Analysis; and the Assembly Office of Research Concurrence in Senate Amendments Analysis all, in essence, state what was stated in the first mentioned analysis with respect to the proposed amendment and that is: "Under existing law it is a misdemeanor to use an incorrect weight or measure in the buying or selling of any commodity. This would also make it a misdemeanor to use an incorrect weight or measure for determining the charge for a service."

state in which Pitney-Bowes operates are its scales or repairmen regulated by agencies other than the ICC or the local PUC.

It is reasonable to assume that California legislators in their wisdom did not include weighing devices used in the service industry in California's weights and measures regulatory scheme because they assumed, as they must, that the USPS and the ICC-PUC were doing their job; that there was adequate regulation on the federal level for consumer protection and that the stacking on of two more layers of bureaucratic regulation at the state and county level[10] simply was unnecessary and unwarranted.[11]

In short we find the arguments of defendants State and County relating to statutory construction of the statute under consideration strained and unpersuasive. They suggest that the consumer protection purpose of the legislation would justify this court to construe the statute to apply to plaintiff's scales. If we were to construe the statute in the manner urged by defendants, it would require us to take pen in hand and literally write into section 12210, subdivision (a), after the word "reward" the clause "or in computing any basic charge or payment for services rendered on the basis of weight or measure"; write into section 12510 the

---

[10]The evidence in the case at bench indicates that if the regulatory and licensing scheme was applicable to plaintiff herein, substantial bureaucratic burdens would be stacked into plaintiff's business operations on the state and county level. For example, plaintiff in addition to design interference by a governmental agency would be required to change its distribution procedures to allow for inspection and sealing within the various counties which would involve considerable expense in unpacking, setting up and repacking the scales; the additional paperwork of giving notification of sale and installation would require additional red tape (in 1977 alone plaintiff sold 5,094 scales in California); registration of plaintiff's 337 device repairmen in California and the notices required of them would entail additional expense and red tape (the application fee for device repairmen is $5 per man and would require special training in all aspects of the California statute); and the notices of repair and adjustment would entail a great amount of additional paperwork. In argument before the trial court counsel for plaintiff said: "With respect to notice of repair or adjustment, which is described in various exhibits that have been received in evidence, Mr. Goodwin estimated that during 1975, '76, and '77, there were 17,000, 33,000, and 16,000 reportable service calls made, respectively, in those years, which would have, under section 12515, resulted in a report to the State, so somewhere in the neighborhood of 15,000 to 35,000 reports of repairs to the State...."

[11]In our view defendants' concern for consumer protection of those using plaintiff's scales other than USPS and UPS and their customers is probably unwarranted. The design, quality control, testing and repair arrangements of Pitney-Bowes along with the oversight by the USPS and the ICC-PUC carries through and provides safeguards in respect to possible overcharges on Pitney-Bowes' scales which may be used by those other than USPS or UPS or their customers.

clause "or for determining the charge for a service" which has already been rejected, for whatever reason, by the Legislature; add the words "or service" after the word "commodity"; and make related changes throughout the entire statute. This would require a wholesale rewriting of the statute and would consist of rank judicial legislation.[12] This, in deference to constitutional concept of separation of powers, we refuse to do. "If it is advisable that [a] statute be changed, the solution lies within the province of the Legislature."[13] (*Orpustan v. State Farm Mut. Auto. Ins. Co.* (1972) 7 Cal.3d 988, 994 [103 Cal.Rptr. 919, 500 P.2d 1119].)

In summary, for the reasons stated, we conclude that the legislative intent and purpose of the mandatory regulatory and licensing scheme embodied in section 12001 et seq. is to protect consumers from unfair dealings where the person who sells tangible goods weighs the goods and collects a charge based on the weight of the goods sold and does not apply when scales are used, as in the instant case, to determine a charge for a delivery service.[14]

---

[12]In our view, absent a clear legislative mandate, in the interest of the wise public policy of avoiding uncalled for and unnecessary regulation in the free market place, courts should exercise judicial restraint and refrain from scratching administrative agencies' itch to expand their regulatory powers.

[13]There is no showing whatsoever that customers' scales used in computing delivery charges are resulting in an overcharge for postal and parcel delivery services. If such a showing ever surfaced in respect to scales used by USPS and UPS which was not adequately covered by the penalty provisions of the statute, it would appear that the USPS and the ICC-PUC should be advised so that those agencies could take corrective action. If evidence was ever uncovered of the overcharging of customers other than USPS and UPS, it would appear that the proper forum for making changes and finding solutions is the state Legislature. The Legislature is better equipped to conduct investigations and conduct hearings where the competing views of consumer protective groups and representatives of the service industry can be aired. The Legislature is better equipped than the courts to ask and answer such questions as: "Is there a problem of overcharging by reason of the use of scales in the service industry? If so, how widespread is it? and would the financial cost passed on to consumers by reason of the burdens added to the service industry and increased taxes imposed to fund additional regulations exceed overcharges, if any? What would be the impact on the service industry as a whole?" Courts are not equipped to look into or effectively handle such questions.

[14]We note that in a letter from plaintiff Pitney-Bowes' counsel to general counsel for the State dated April 10, 1975 (plaintiff's exhibit No. 1), there is the statement that "if the [State] believes that Pitney-Bowes scales may potentially be used in isolated instances for commercial purposes, we believe that Pitney-Bowes would undertake a reasonable program designed to limit or eliminate even such isolated instances. Pitney-Bowes is always available to assist in whatever manner it can and is always available for discussion in that regard."

Having so concluded, we need not address plaintiff's other contentions that the regulations, if applicable, would violate the supremacy clause of the United States Constitution in respect to postal scales and would violate the interstate commerce clause of the United States Constitution and article XII of the California Constitution in respect to UPS scales.

DISPOSITION

The judgment of the superior court is affirmed in its entirety.

Lillie, Acting P. J., concurred.

SCHWARTZ, J.*—I dissent. To distinguish a "commercial" weighing or measuring device from a "non-commercial" device, it is necessary to look to what use the device is put. Plaintiff's scales are used for the following purposes: (a) Use by USPS to compute postal charges; (b) use by customers of USPS to compute the postal charges; (c) use by customers of UPS to compute parcel delivery charges; (d) use by parcel delivery services other than USPS and UPS to compute delivery charges; or (e) use by customers of parcel delivery services other than USPS and UPS to compute parcel delivery charges. The record reflects that there were approximately 39,600 Pitney-Bowes scales in California as of April 21, 1978.

United Parcel Service (UPS) is in the business of picking up and delivering small packages. UPS gets customer packages in three ways. First, it has a customer counter where business and individuals bring in their own packages, which are weighed and charges computed on scales owned by UPS. These scales have to be sealed but UPS does not use any Pitney-Bowes scales at its counters in California. The other two ways involve UPS picking up packages at the customers' locations. One way is the automatic, daily pickup from certain customers; the other is the occasional pickup on request from either business or individual customers. Either way, the customer is expected to have a scale and to weigh every package and compute the UPS charge using a UPS rate chart before the package is picked up by UPS. In the case of some individuals who are only occasional customers, this may be done on a bathroom scale, although most regular customers use scales and metering devices made by Pitney-Bowes, Friden, Postalia, National Cash Register, or Orbitron.

*Assigned by the Chairperson of the Judicial Council.

UPS has approximately 69,000 daily pickup customers in California and makes about 2,000 pickups each day on request. These customers ship 620,000 packages a day. Calculating 20-21 working days a month and an average service charge of $1.50 per package, UPS collects upward of $20 million each month in charges computed by scales such as those manufactured by Pitney-Bowes.

UPS pickup customers make the computations that result in all these charges. UPS reserves the right to make a final determination as to any charge and makes adjustments when it audits and finds an error in the customer's computation. However, UPS audits each daily pickup customer a minimum of only one day a year, and even then UPS does not always audit every package in the customer's daily shipment. Furthermore, whether occasional pickup customers ever get audited is largely a matter of chance. This alone is not adequate protection for the consumer who causes 620,000 packages a day to be weighed and shipped daily. These figures as to the use of the Pitney-Bowes scales clearly demonstrate that they play a significant role in the stream of commerce.

Even if we assume that "commodities" in division 5 of the Business and Professions Code refers only to tangible goods, a questionable assumption,[1] there can be little doubt that service transactions fall within the general term "business intercourse." The United States Supreme Court recognized this in *Adair* v. *United States* (1908) 208 U.S. 161, 177 [52 L.Ed. 436, 443, 28 S.Ct. 277], when it defined "commerce among the several states" to include a number of services: "...traffic, intercourse, trade, navigation, communication, the transit of persons, and the transmission of messages by telegraph...."

---

[1] It might be argued that the juxtaposition of the terms "commodity" and "service" as between sections 12024 and 12024.1 and within section 12510, subdivision (d) indicates that the terms are mutually exclusive for purposes of division 5. Nevertheless, this runs counter to the modern understanding of the term "commodity," dating back to *Gibbons* v. *Ogden* (1824) 22 U.S. (9 Wheat.) 1, 229 [6 L.Ed. 23, 78], where the United States Supreme Court defined "commerce" as follows: "Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce;..." The California Supreme Court has taken a similar view in cases regarding the meaning of "commodities" under the Cartwright Act. That court has held that a definition limiting "commodities" to goods, not services, is "insupportable in California case law, which has broadly defined 'commodity.'" (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 927 [130 Cal.Rptr. 1, 549 P.2d 833].) The court has further declared that "a service consisting in the main of human labor" is a commodity even though the Cartwright Act specifically provides that labor alone is not. (*Marin County Bd. of Realtors, Inc., supra; Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873, 886 [4 Cal.Rptr. 179, 351 P.2d 347].)

That service transactions are included in "commercial" is also clear under Webster's second definition with its emphasis on financial profit. There is no qualification that could even arguably distinguish services from goods. Subsequent dictionary definitions of "commercial" repeat this definition: "...from the point of view of profit; having profit as the primary aim...." (Webster's Third New Internat. Dict. (unabridged 1961).) "Having financial profit as the primary aim...." (Funk & Wagnalls Standard Collegiate Dict. (1973).) "Having profit, success, or immediate results as a chief aim: a commercial painter...." (American Heritage Dict. of the English Language (new college ed. 1976).)

All these definitions emphasize the business element of the meaning of "commercial." While "commerce" once simply referred to goods, that definition was outdated by at least the early 19th century, as the practical realities of modern life brought services onto an equal footing. (See *Gibbons* v. *Ogden* (1824) *supra*, 22 U.S. 1, 229 [6 L.Ed. 23, 78].) The state Court of Appeal has recently recognized this fact once again, in *Siegel* v. *City of Oakland* (1978) 79 Cal.App.3d 351, 358 [145 Cal.Rptr. 62]. There, the test of whether city-owned parking meters were "commercial" turned on whether they were used in a business relationship, *not* whether goods or services were involved.

There is no doubt that the purpose of division 5 is to protect the consumer by assuring that weighing and measuring devices used in commercial transactions are accurate (46 Ops.Cal.Atty.Gen. 103, 104 (1965)). Consumer protection statutes should be liberally construed so as to accomplish their purpose. (See *In re Fujii* (1922) 189 Cal.55, 58-59 [207 P. 537].) Where they are susceptible of two constructions, one of which, in application, would render the statutes harmonious with the legislative purpose and one of which would be productive of absurd consequences, the former construction will be adopted. (*County of Orange* v. *Heim* (1973) 30 Cal.App.3d 694, 713 [106 Cal.Rptr. 825]; *Hall* v. *C & A Navarra Ranch, Inc.* (1972) 24 Cal.App.3d 774, 788 [101 Cal.Rptr. 249]; *City of Plymouth* v. *Superior Court* (1970) 8 Cal. App.3d 454, 466 [96 Cal.Rptr. 636].) Appellants State and County contend that division 5 should be construed so as to afford maximum protection to consumers and that "commercial" should thus be construed to include service transactions as well as tangible goods transactions.

Pitney-Bowes agrees that the purpose of division 5 is consumer protection but only in transactions involving the sale of goods.

There is no reason to distinguish between selling goods and selling services. The purpose of division 5 is to protect consumers from being overcharged due to an inaccurate scale. An inaccurate scale can result in overcharge whether it is used to compute the cost of goods sold according to weight or the cost of service of processing or shipping goods according to their weight. It makes no difference to the overcharged consumer whether he is overpaying for goods or for a service. He is still being overcharged, and it is hard to imagine that the Legislature intended to protect him in one instance and not in the other. In the absence of any evidence showing legislative intent to so limit the protection of division 5, such an absurd consequence should not be imposed by judicial construction.

On the other hand, it makes sense to define "commercial" in terms of the business nature of the transaction rather than on the basis of what is sold. The crucial fact is that money changes hands in a business relationship based on the weight shown on a scale. This is in contrast, for example, to the situation covered in section 12500, subdivision (c), wherein a scale is used "solely within a plant or business."

The most reasonable interpretation of "commercial," consistent with the consumer protection intent of division 5, is in reference to the use of weighing or measuring devices in business transactions in which the parties paying the charges computed by the devices do not control them. This would exclude from regulation bathroom scales used by individuals to compute their own charges and also scales used by merchants and businesses to compute charges that are not passed on to their customers; but it would regulate scales used by merchants and businesses to compute USPS or UPS shipping charges which are passed on to their customers.

In light of the modern understanding of "commercial," the consumer protection purpose of division 5, and the illogic of artificially distinguishing services transactions from goods transactions in regard to inaccurate scales, any ambiguities in the statutory language itself should be resolved in favor of the construction more protective of the consumer, the logical inclusion of service transactions within the meaning of "commercial" and within the requirements of division 5.

### The Rejected Amendment to Assembly Bill No. 1711 Offers No Support for Excluding Service Transactions From "Commercial"

Pitney-Bowes' use of a rejected amendment to Assembly Bill No. 1711 is not persuasive in support of its position. Pitney-Bowes contends that the amendment was rejected because it would have enlarged the coverage of misdemeanor section 12510, subdivision (a) to apply to service transactions, and that this shows that "commodity" transactions, already covered by the statute, do not include services. However, unadopted legislative proposals have limited value as indicators of legislative intent. (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 58 [69 Cal.Rptr. 480]; *Ambrose* v. *Cranston* (1968) 261 Cal.App.2d 137, 143-144 [68 Cal.Rptr. 22].)

For the reasons stated herein, the model approval, testing, sealing, notification, and device repairmen requirements of division 5 of the California Business and Professions Code should be applied to scales, such as those manufactured and sold by Pitney-Bowes, which are sold or used to determine charges for shipping packages according to weight.

I would reverse the judgment.

Appellants' petition for a hearing by the Supreme Court was denied October 15, 1980. Bird, C. J., did not participate therein. Tobriner, J., and Manuel, J., were of the opinion that the petition should be granted.