[No. E007483. Fourth Dist., Div. Two. May 20, 1991.]

EL DORADO PALM SPRINGS, LTD., etc., Plaintiff and Respondent, v.
RENT REVIEW COMMISSION OF THE CITY OF PALM SPRINGS,
Defendant;
RESIDENTS OF THE EL DORADO MOBILE HOME PARK, Real
Parties in Interest and Appellants.

[Opinion certified for partial publication.*]

*This opinion is certified for publication pursuant to rules 976(b) and 976.1 of the
California Rules of Court except as to sections I.B., II, III, IV and V of this opinion.

**COUNSEL**

Charles A. Prawdzik for Real Parties in Interest and Appellants.

William J. Adams, City Attorney (Palm Springs), Siegfried H. Siefkes, Assistant City Attorney, Freilich, Stone, Leitner & Carlisle and Benjamin

Kaufman as Amici Curiae on behalf of Real Parties in Interest and Appellants.[1]

Shapiro, Posell & Close, Richard E. Posell, Jonathan J. Panzer, Lisa K. Skaist, Best, Best & Krieger, Paul T. Selzer and Basil T. Chapman for Plaintiff and Respondent.

## OPINION

TIMLIN, J.—This case involves a dispute between the owner/operator of a Palm Springs mobilehome park (the petitioner below and the respondent herein—referred to hereinafter as El Dorado) and the residents of that mobilehome park (the real parties in interest below and the appellants herein—referred to hereinafter as the residents). The gist of the dispute concerns the application of the Palm Springs municipal rent-control laws by the Palm Springs Rent Review Commission (the respondent below—referred to hereinafter as the Commission) to the space rents to be charged in that mobilehome park.

The residents appeal from an order of the trial court, which order granted El Dorado's petition for a writ of mandate to compel the Commission to approve El Dorado's application for a hardship rent increase. By their appeal, the residents have called upon us to rework the fertile fields of contention which we first plowed in *Palacio de Anza* v. *Palm Springs Rent Review Com.* (1989) 209 Cal.App.3d 116 [257 Cal.Rptr. 121] (hereinafter *Palacio*). We conclude that the trial court's order is correct in all respects, and we consequently affirm the same.

### FACTS[2]

On April 8, 1980, the citizens of the City of Palm Springs adopted an initiative rent-control ordinance. In general terms, this initiative ordinance:

[1] In point of fact, the amici curiae in this case represent the position taken by the defendant commission. By order of this court dated August 3, 1990, the commission's respondent's brief was deemed to be an amicus curiae brief pursuant to rule 14(b) of the California Rules of Court.

[2] In large part, our description of the municipal background underlying this dispute is taken from our opinion in *Palacio*.

(1) prohibited rent increases from being imposed more frequently than once a year; (2) limited rent increases to rates of no more than three-fourths of the percentage increase in the consumer price index over any one-year period of time in question; (3) did not contain a "hardship rent increase" provision for landlords, other than a provision which declared the ordinance to be nonapplicable to those rental properties as to which the ordinance would operate in a "confiscatory" manner; and (4) required that a determination as to whether such a confiscatory impact had occurred in any one particular case be made by the courts. The initiative ordinance also permitted the City Council of Palm Springs to "supplement" the initiative ordinance "so long as Palm Springs in no way diminishes any protection which this ordinance affords to tenants." (Initiative Ord., § 10.)

On October 1, 1980, the Palm Springs City Council adopted Ordinance No. 1117. This ordinance apparently was adopted to forestall a constitutional challenge to the initiative rent-control ordinance.[3] Ordinance No. 1117 supplemented the initiative ordinance by creating a rent review commission and providing for hardship increases in rents over and above those allowed by the initiative ordinance in certain limited circumstances.

On November 18, 1983, the Commission conveyed a written recommendation to the city council that the city council adopt certain "Guidelines For Hardship Rent Increases" (hereinafter referred to as the Guidelines). The Guidelines set forth a very specific format and procedure for evaluating landlord applications for hardship rent increases. Among the provisions contained in the recommended Guidelines was a provision (section 101(c)(1)(xii)) which permitted the inclusion of certain purchase money financing interest payments (debt service costs) in the costs which were allowable for the purpose of calculating a landlord's "net operating income."[4] In accordance with the Commission's recommendation, the city council adopted the Guidelines by resolution on December 7, 1983.

---

[3] Ordinance No. 1117 was apparently intended to overcome any possible constitutional shortcoming in the initiative ordinance resulting from the lack of an "adjustment mechanism" in the initiative ordinance for modifying maximum rental rates in particular cases. (See *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 169-174 [130 Cal.Rptr. 465, 550 P.2d 1001].)

[4] These "allowable costs" are oftentimes referred to (both in this opinion and in general) as "allowable operating expenses."

The Palm Springs rent-control law seeks to assure that each landlord receives a "fair" financial return from the landlord's rental property. This return is expressed in terms of a landlord's "net operating income." "Net operating income," in turn, is defined (in a general way) as a landlord's gross income minus allowable operating expenses. The greater the number, amount and types of operating expenses "allowed" for the purpose of calculating a landlord's net operating income, then, the smaller the net operating income itself will be (for

On January 18, 1984, the city council adopted Ordinance No. 1213. This ordinance was intended to simply restate and codify (as part of the municipal code) the provisions of the prior rent-control ordinances, beginning with the initiative ordinance, and not to supersede or repeal any of those preexisting provisions.

In the spring of 1986, El Dorado was in the process of finalizing its negotiations for the purchase of the mobilehome park here in question. Section 101(c)(1)(xii) of the Guidelines, the provision that allowed purchase money debt service costs to be included as an allowable operating expense in calculating a landlord's net operating income, was of particular concern to El Dorado. El Dorado insisted on a clause in the purchase agreement that would permit it (El Dorado) to withdraw from the purchase of the mobilehome park if the Guidelines (and, in particular, § 101(c)(1)(xii)) changed materially prior to the close of the purchase escrow.[5] No such changes in the Guidelines occurred prior to the close of the purchase escrow, and, on April 1, 1986, El Dorado purchased the mobilehome park for the sum of $7.5 million—some $7,360,000 of which was financed by promissory notes secured by deeds of trust. On that same day, April 1, 1986, El Dorado filed an application with the Commission for a hardship rent increase. On a "per space" basis, El Dorado's application sought the Commission's approval of a $179.46 monthly rental increase. El Dorado justified its request for a rent increase, to a significant extent, by reference to its purchase money debt service cost. The residents opposed the application before the Commission.

On April 16, 1986, the Commission opened its hearing on El Dorado's application for a hardship rent increase. This hearing was conducted periodically over the next two years and three months.

---

any one given level of gross income)—thus making it more likely that a landlord would be permitted to impose a hardship rent increase.

On another, related issue: The Guidelines (as originally adopted) did not permit the characterization of *all* purchase money debt service costs as an allowable operating expense. Rather, it was only the portion of those costs which exceeded the level of such costs on September 1, 1979, which were "allowable" as an operating expense in calculating a landlord's net operating income. Whenever we refer in this opinion to El Dorado's purchase money debt service costs, we are referring only to this "excess" cost borne by El Dorado.

[5]At oral argument, the Commission contended that El Dorado's interest in section 101(c)(1)(xii) might better be characterized by reference to the words used by the Commission in its final findings and decision relating to El Dorado's petition: "Petitioner was aware of the provisions of this guideline before the park was purchased. The provisions of this guideline were a factor in petitioner's decision to purchase the subject property." The language we have used to describe El Dorado's interest in section 101(c)(1)(xii) is not inconsistent with the above language used by the Commission in its findings and decision. Further, the language we have used to describe El Dorado's interest in section 101(c)(1)(xii) better reflects the actual, and uncontradicted, testimony given by El Dorado during the Commission's hearing on the matter.

On November 7, 1986, while El Dorado's application for a hardship rent increase was still pending, the Commission recommended to the Palm Springs City Council that it (the city council) repeal section 101(c)(1)(xii) of the Guidelines. On December 15, 1986, the city council acted on this recommendation and adopted Resolution No. 16072, repealing and deleting section 101(c)(1)(xii) from the Guidelines.

On July 18, 1988, the Commission completed its hearing on El Dorado's 1986 application for a hardship rent increase and indicated its intended decision on the matter. On October 17, 1988, the Commission issued its final written findings and decision with respect to that application. Of particular interest here, the Commission declined to allow El Dorado's purchase money debt service cost as an operating expense in calculating El Dorado's net operating income, concluding that the city council's repeal of section 101(c)(1)(xii) of the Guidelines had had the effect of eliminating those costs as an allowable operating expense insofar as El Dorado's application for a rent increase was concerned.[6] The net result of the Commission's decision was an approval of a $65.17 "per space" monthly rental increase for El Dorado—some $114.29 per space/per month less than the increase for which El Dorado had applied.

In the meantime, on July 26, 1988 (shortly after the Commission had completed its hearing on El Dorado's rent increase application but before the Commission's final written decision on that application was released), El Dorado notified its residents that the monthly space rentals within the mobilehome park would be increased, effective September 1, 1988, by $65.17 per space. El Dorado has, in fact, collected the $65.17 per space monthly rental increase since September 1, 1988.

On March 3, 1989, this court filed its opinion in *Palacio*. In that opinion, we addressed and resolved many of the same regulatory issues which had

---

[6]Somewhat more accurately, the Commission *did* allow a partial increase in the amount of debt service cost to be "passed through" as an operating expense, but the partial increase was *not* allowed as a "hardship increase." Rather, the Commission calculated a "standard" debt service cost increase—three-fourths of the percentage increase in the consumer price index from 1979 (the "base year" for the purpose of calculating cost increase allowances) to 1986 (the year of El Dorado's application for a "hardship" rent increase)—applied that reduced the percentage to the amount of annual debt service cost borne by El Dorado's predecessor-in-title in 1979, and allowed the resulting figure ($107,368) as an increase in El Dorado's allowable operating expenses. Noteworthy here, the amount of increased debt service cost allowed to El Dorado by the Commission as an operating expense: (1) was allowed pursuant to the "standard" rental increase provisions of the applicable local regulations, not pursuant to the extraordinary "hardship" rental increase provisions of those regulations; and (2) was less than one-fifth of the $578,142 borne by El Dorado in 1986 as increased debt service cost.

On a related matter, the Commission also declined to treat certain capital expenditures made by El Dorado as an allowable cost in calculating El Dorado's net operating income.

been points of contention during the Commission's hearing on El Dorado's application for a hardship rent increase. In particular, we had occasion in *Palacio* to address the interplay between (1) section 101(c)(1)(xii) of the Guidelines, (2) the repeal of that section by the Palm Springs City Council and (3) purchase money debt service obligations which predated the repeal of that section. In *Palacio*, we held:

"The Guidelines and rent-control ordinances did not create a statutory 'right of action' in Palacio. Rather, those enactments created land-use property rights which became vested in Palacio when the financing of the apartment purchase was undertaken in reliance on the existing rent-control laws. In this sense, Palacio enjoys a situation or status analogous to that of one who has established the right to pursue a nonconforming use on land following a zoning change. (*City of Santa Barbara* v. *Modern Neon Sign Co.* (1961) 189 Cal.App.2d 188 [11 Cal.Rptr. 57].) Any attempt to retroactively apply the repeal of the Guidelines' debt financing cost allowance to Palacio's vested rights would constitute an invalid impairment of an established economic/property interest without due process of law. [¶] Notwithstanding the adoption of resolution No. 16072 [the repeal of section 101(c)(1)(xii) of the Guidelines], Palacio continues to enjoy the benefit of the Guidelines' debt financing cost allowance provisions which were in effect when Palacio assumed its purchase debt obligation." (*Palacio, supra,* 209 Cal.App.3d at pp. 120-121.)

On May 22, 1989, encouraged by our opinion in *Palacio*, El Dorado filed a petition for a writ of mandate in the court below. In general terms, El Dorado's petition sought the issuance of a writ of mandate to compel the Commission to grant that portion of El Dorado's application for a hardship rent increase which had not previously been granted by the Commission. As noted above, far and away the most significant issue remaining in dispute between El Dorado and the Commission was the allowance of El Dorado's purchase money debt service costs as an operating expense for the purpose of calculating El Dorado's net operating income.

The residents filed a demurrer to El Dorado's petition for a writ of mandate. The residents' demurrer was largely based on their argument that the 90-day statute of limitations set forth in section 1094.6 of the Code of Civil Procedure controlled El Dorado's challenge to the Commission's decision, that this statute of limitations had expired prior to El Dorado's having

filed its petition for a writ of mandate, and that, consequently, the trial court was without jurisdiction to consider the matter.[7]

Following a hearing on the matter, the trial court concluded that the Commission had failed to comply with the notice requirements of section 1094.6, subdivision (f), and that the 90-day statute of limitations provided by section 1094.6 had consequently been tolled prior to El Dorado's having filed its petition for a writ of mandate. Having reached the above conclusion, the trial court overruled the residents' demurrer.[8]

Following further briefing and a hearing on the merits of El Dorado's petition for a writ of mandate, the trial court granted El Dorado's petition on December 4, 1989. On December 8, 1989, the trial court issued a detailed writ of mandate. In primary effect, the writ compelled the Commission to apply the provisions of (the now repealed) section 101(c)(1)(xii) of the Guidelines to El Dorado's application for a hardship rent increase so as to allow El Dorado's purchase money debt service costs as operating expenses in calculating El Dorado's net operating income. The writ also compelled the

---

[7]Section 1094.6 of the Code of Civil Procedure, and its various subdivisions, will hereinafter be referred to by section number, and/or by subdivision letter designation, only.

In pertinent part, section 1094.6 provides:

"(a) Judicial review of any decision of a local agency, . . . may be had pursuant to Section 1094.5 of this code only if the petition for writ of mandate pursuant to such section is filed within the time limits specified in this section.

"(b) Any such petition shall be filed not later than the 90th day following the date on which the decision becomes final. If there is no provision for reconsideration of the decision in any applicable provision of any statute, charter, or rule, for the purposes of this section, the decision is final on the date it is made. . . .

" . . . . . . . . . . . . . . . . . . . . .

"(e) As used in this section, decision means a decision subject to review pursuant to Section 1094.5, . . . denying an application for a permit, license or other entitlement, . . .

"(f) In making a final decision as defined in subdivision (e), the local agency shall provide notice to the party that the time within which judicial review must be sought is governed by this section. . . .

"(g) This section shall be applicable to a local agency only if the governing board thereof adopts an ordinance or resolution making this section applicable. If such ordinance or resolution is adopted, the provisions of this section shall prevail over any conflicting provision in any otherwise applicable law relating to the subject matter, unless the conflicting provision is a state or federal law which provides a shorter statute of limitations, in which case the shorter statute of limitations shall apply."

With regard to subdivision (g), above, the Palm Springs City Council adopted an ordinance (Ord. No. 1162) on September 15, 1982, making section 1094.6 applicable to the judicial review of local administrative decisions.

[8]The trial court also found that the residents, through their prior attorney of record, had waived any statute of limitations argument under section 1094.6. Inasmuch as we agree with the trial court's determination that the 90-day statute of limitations provided by section 1094.6 was tolled in this case, we need not address the correctness of the trial court's waiver determination.

Commission to allow, as operating expenses, certain other lesser costs borne by El Dorado (costs previously denied by the Commission as allowable operating expenses) in calculating El Dorado's net operating income.

The residents have appealed from the trial court's grant of El Dorado's petition for a writ of mandate. On appeal, the residents have raised the following contentions: [9] (1) The trial court acted in excess of its jurisdiction in granting El Dorado's petition for a writ of mandate in that the 90-day statute of limitations applicable to El Dorado's petition (the statute of limitations set forth in § 1094.6) had long since expired by the time El Dorado filed its petition; (2) the decision which was issued by the Commission with respect to El Dorado's application for a hardship rent increase was res judicata (after 90 days had run from the date of the decision) as to any subsequent proceeding concerning the same subject matter; (3) El Dorado, having accepted the benefit of the rent increase allowance which was granted by the Commission, was estopped from seeking a writ of mandate in an effort to obtain an even greater rent increase; (4) the trial court's decision to issue the writ of mandate was improper in that it was based on an invalid, unenforceable provision of the Guidelines (§ 101(c)(1)(xii) of the Guidelines); (5) *Palacio* is wrongfully decided, and El Dorado cannot be deemed to have acquired a vested right to indirectly "pass through" purchase money debt service costs to the mobilehome park residents as an allowable operating expense; and (6) the writ of mandate issued by the trial court violates the separation of powers doctrine by excessively intruding on the Commission's own discretionary authority (see Code Civ. Proc., § 1094.5, subd. (f)).[10]

We conclude that the residents' contentions are without merit and affirm the trial court's order (and writ) in full. Additional facts will be referred to, as needed, in the discussion which follows.

---

[9] This listing of contentions has been somewhat reordered and recharacterized by us in the interest of (1) sequencing the contentions in a more logical order and (2) clarifying the underlying legal issues raised by the residents on appeal.

[10] The degree of judicial deference to administrative discretion which is required of courts in this area of the law by the separation of powers doctrine is statutorily expressed in subdivision (f) of section 1094.5 of the Code of Civil Procedure: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent."

DISCUSSION

I.

THE TIMELINESS OF EL DORADO'S PETITION FOR A WRIT OF MANDATE

A. *The Application of Section 1094.6.*

 The parties are in agreement that section 1094.6 governs the timeliness of El Dorado's petition for a writ of mandate. The parties are also in agreement that: (1) El Dorado's petition was filed more than 90 days after the Commission's final written decision was issued; and (2) the Commission never gave El Dorado direct notice that section 1094.6 would govern the timeliness of an attempt to secure judicial review of the Commission's decision.[11] Not surprisingly, however, the parties are in disagreement as to whether El Dorado's petition for a writ of mandate was timely under this set of circumstances.

The effect of a failure by a local agency to provide the notice required by section 1094.6, subdivision (f), on the running of the 90-day statute of limitations set forth in subdivision (b) of that section was recently addressed in *Cummings v. City of Vernon* (1989) 214 Cal.App.3d 919 [263 Cal.Rptr. 97]:

"In light of the background of this statute we conclude the Legislature intended the [90-day] period to run from the date of giving notice. The legislative background and the purpose of section 1094.6 were discussed in *Hittle* v. *Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 386-387 [216 Cal.Rptr. 733, 703 P.2d 73]. Prior to enactment of section 1094.6, petitions for administrative mandamus to review local agency decisions were subject to the general statutes of limitations, which were three years for statutory liability and four years for other cases unless otherwise specified. (*Id.* at p. 386.) Courts criticized these periods as unduly long, and section 1094.6 was the legislative response to this problem. It gave local agencies the *option* of adopting, by ordinance or resolution, a 90-day limitation period for seeking judicial review of their administrative decisions. (*Id.* at pp. 386-387.)

---

[11]It is, perhaps, somewhat overstating the matter to say that there is an "agreement" to the effect that the Commission failed to directly provide El Dorado with the notice required by section 1094.6, subdivision (f). However, neither the residents nor the Commission argues that such notice *was* directly given—and *the record is devoid of any indication that such a notice was given.*

"This background makes clear the importance of the notice requirement in subdivision (f). Without the enactment of section 1094.6 and adoption of section 1094.6 by local ordinance or resolution, the applicable statute of limitations would be three or four years. The Legislature considered it vitally important that parties be notified a 90-day period is applicable instead.

"Since the application of section 1094.6 drastically reduces the statute of limitations, we should avoid an interpretation which shortens the period even further. In *Hittle* v. *Santa Barbara County Employees Retirement Assn., supra,* 39 Cal.3d at page 387, the court held that section 1094.6 impliedly prohibits the local agency from adopting a limitation period *shorter* than 90 days. If the period in section 1094.6 were to run from the date of the decision regardless of the date of notice, any substantial delay in giving the notice would, as a practical matter, substantially reduce the actual time available for preparing a petition. Since section 1094.6 benefits local agencies by reducing the statute of limitations, requires local agencies to give the notice, and impliedly prohibits local agencies from adopting a shorter limitation period, it should not be interpreted in a way which permits local agencies to shorten the period even further by delaying the notice. This is avoided if the local agency's decision does not become final for the purpose of subdivision (b) until the notice required by subdivision (f) is given." (*Cummings* v. *City of Vernon, supra*, 214 Cal.App.3d at pp. 922-923.)

*Cummings* reached its conclusion that a local agency decision should not be deemed to be final for the purpose of subdivision (b) until the notice was given pursuant to subdivision (f), at least in part, because of the peculiar language used by the Legislature in subdivision (f): *"In making a final decision . . . the local agency shall provide notice . . . ."* (Italics added.) *Cummings* saw this language as "reasonably impl[ying] that providing the notice is an essential condition for the decision to become final." (214 Cal.App.3d at p. 922.)

While we agree with *Cummings* that the 90-day statute of limitations of section 1094.6 does not begin to run until the subdivision (f) notice is given, we do not agree that that notice must be given in order that the local agency's decision be deemed final for the purpose of subdivision (b). There are two reasons for our disagreement. First, it seems to us that one must give section 1094.6 a strained reading to conclude that that section uses the phrase "final decision" to mean anything other than, or more than, the substantive decision reached, and then issued in final form, by a local agency following the completion of that agency's administrative decision-making processes. Second, taken to its (il)logical conclusion, *Cummings*'s position

on "finality" would permit a local agency to preclude a decision's *ever* becoming final by the simple expedient of never issuing a notice pursuant to subdivision (f). In light of the fact that only "final" administrative decisions are subject to judicial review (see Code Civ. Proc., § 1094.5, subd. (a)), *Cummings's* position on "finality" results in a state of affairs wherein the mere failure of a local agency to give notice pursuant to subdivision (f) effectively insulates an agency decision from judicial review. This, clearly, is not a result intended by our Legislature.

It seems to us that the better course in interpreting section 1094.6 is to avoid any attempt to give "finality" a strained reading and, instead, to simply read the section as containing a 90-day statute of limitations that is *tolled* until such time as the subdivision (f) notice is given. This interpretation of the section best achieves the overall harmonization of the section's various subdivisions. (*Pitney-Bowes, Inc.* v. *State of California* (1980) 108 Cal.App.3d 307, 313 [166 Cal.Rptr. 489].) We make the following two observations concerning our interpretation of section 1094.6:

(1) Under this interpretation, an aggrieved party need not wait until receiving notice pursuant to subdivision (f) to seek judicial review of a local agency's administrative decision—that decision is "final" under subdivision (b) as soon as the local agency has issued its decision in final form;[12] and

(2) A failure by a local agency to give a subdivision (f) notice would not give an aggrieved party an "open-ended" period of time within which to seek judicial review of the administrative decision in question.[13] Notwithstanding the tolling of the 90-day statute of limitations in such a case, the doctrine of laches would still apply to the timeliness of a party's effort to secure judicial review. ■ It is clear that mandamus is a type of action in which equitable principles, such as the doctrine of laches, apply. (*Hittle* v. *Santa Barbara County Employees Assn.* (1985) 39 Cal.3d 374, 386 [216 Cal.Rptr. 733, 703 P.2d 73], citing *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 357, fn.3 [82 Cal.Rptr. 337, 461 P.2d 617].) It is equally clear that laches may apply independently in a mandate proceeding, notwithstanding the existence of an applicable statute of limitations. (*People*

---

[12]In those instances where an agency provides for an administrative reconsideration of its decisions, a decision would not be "final" until the opportunities for administrative reconsideration had been exhausted or, in appropriate cases, otherwise allowed to expire.

[13]El Dorado has suggested that the prior three- and four-year statutes of limitation (see discussion in *Cummings, ante*) would apply if the local agency failed to ever give a subdivision (f) notice. This suggestion lacks merit, however, because it simply ignores subdivision (g)—the provision which gives section 1094.6, if adopted, overriding authority with respect to the timeliness of a petition for judicial review.

v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 195 [119 Cal.Rptr. 266].)[14]

■ The residents have argued that the notice requirement of subdivision (f) was met for all practical purposes just as soon as the Commission issued its final decision. The residents base their argument on their contention that counsel for El Dorado is so knowledgeable in the area of municipal law that they must have known of the 90-day statute of limitation. This argument is utterly specious. The residents' argument completely ignores the clear statutory mandate set forth in subdivision (f) that "the local agency shall provide notice to the party."[15]

The Commission argues, in its amicus brief, that the city's adoption of section 1094.6 by ordinance constitutes constructive notice to all parties of the applicability of that section to local administrative decisions. Again, this argument simply overlooks, or ignores, the plain mandate of subdivision (f). The use of the phrase "In making a final decision" in subdivision (f) compels the conclusion that the Legislature intended that a local agency be responsible for the additional task of giving direct notice to a party pursuant to subdivision (f) in *each* instance where a final decision is rendered. With respect to the giving of such notice, we note: (1) A "direct" notice is one which is communicated forthwith and in a straightforward manner to a party or that party's recognized agent (e.g., a party's attorney during the proceedings in question) as soon as the administrative decision has become final; (2) a subdivision (f) notice is effective when *given* in the manner outlined in note (1), above, not when it is actually *received*; and (3) there is no statutory requirement that the notice be given in writing—although a local agency might well wish to do so in the interest of establishing a record that the notice was, in fact, given.

El Dorado's petition was not barred by the 90-day statute of limitations set forth in section 1094.6.

[14]The residents have not argued laches at any point in this case, and we do not address the direct applicability of that equitable doctrine to the facts of this case.

[15]The residents have also argued that only four conditions need be met in order that section 1094.6 be applicable and operational in any one given situation—and that all four conditions are met in this case. In support of this argument, the residents cite *Foster v. Civil Service Com.* (1983) 142 Cal.App.3d 444, 450-451 [190 Cal.Rptr. 893]. It is true that *Foster* sets forth four conditions necessary to section 1094.6's becoming applicable and operational in any one given situation—but *Foster* notes that section 1094.6 becomes applicable and operational in the presence of the four conditions "*unless otherwise tolled.*" (*Id.*, at p. 450, italics added.) The residents failed to allude to this critical qualification in their citation to *Foster*.

I.B., II-V.*

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The trial court's order and writ are affirmed in full.

Ramirez, P. J., and McDaniel, J.,† concurred.

Petitions for a rehearing were denied June 3, 1991, and June 10, 1991, and defendant's petition for review by the Supreme Court was denied August 29, 1991. Broussard, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 335.
†Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.