[No. E029198. Fourth Dist., Div. Two. Mar. 14, 2002.]

EL DORADO PALM SPRINGS, LTD., Plaintiff and Appellant, v. CITY OF PALM SPRINGS et al., Defendants and Respondents; EL DORADO MOBILE COUNTRY CLUB HOMEOWNERS ASSOCIATION, Intervener and Respondent.

## COUNSEL

O'Melveny & Myers, James W. Colbert III, Matthew W. Close; Gilchrist & Rutter, Richard H. Close and Thomas W. Casparian for Plaintiff and Appellant.

The Gibbs Law Firm and Timothy J. Gibbs for Associates' Group for Affordable Housing, Inc., Cedarhill Estates Homeowners Association, Apache Mobilehome Park Association, and Glenview Mobile Lodge Owners Association as Amici Curiae on behalf of Plaintiff and Appellant.

Burke, Williams & Sorensen, William W. Wynder and Anthony R. Taylor for Defendants and Respondents.

Charles A. Prawdzik; McFadden and Associates and Robert J. McFadden for Intervener and Respondent.

## OPINION

**HOLLENHORST, Acting P. J.**—Appellant El Dorado Palm Springs, Ltd. (El Dorado), is the owner of a 377-unit mobilehome park in Palm Springs. On September 28, 2000, it filed a petition for writ of mandate to compel approval by respondent City of Palm Springs (City) of its application for a tentative subdivision map. The application, which was initially filed in 1993, sought to subdivide the units within the mobilehome park as the requisite first step in converting the park from a rental mobilehome park to a resident-owned park. Upon subdivision, the parcels would be sold to the current mobilehome owners, or others, to complete the conversion. The application was finally accepted as complete in 1999.

The Palm Springs Planning Commission approved the application for subdivision subject to a number of conditions, and it recommended that the Palm Springs City Council (City Council) approve the application. After several delays, the City Council conditionally approved the application after adding three further conditions.

El Dorado contends that the City Council lacked the authority to impose the three further conditions. The three conditions generally require (1) the use of a "Map Act Rent Date," defined as the date of the close of escrow of not less than 120 lots; (2) the use of a sale price established by a specified appraisal firm, the appraisal costs to be paid by El Dorado; and (3) financial assistance to all residents in the park to facilitate their purchase of the lots underlying their mobilehomes. The total amount of the required assistance would exceed $1 million.

The first condition is especially significant because the selected date would determine when the mobilehome park would cease to be subject to the rent control ordinance of the City. After the map's effective date, the rent control phaseout provisions of Government Code section 66427.5, subdivision (d) would become applicable.[1]

On September 28, 2000, El Dorado filed its petition for writ of mandate to compel approval of the subdivision map without the three further conditions. On October 5, 2000, El Dorado filed a "motion" for a peremptory writ of mandate pursuant to Code of Civil Procedure section 1094. The motion alleged that the facts were undisputed and the only issue was an issue of law, i.e., whether the City Council had the power to impose the three further conditions. Further, the motion alleged that El Dorado's application was approved by operation of law because of the City Council's failure to act on the application within certain statutory time limits.

After hearing, the trial court denied the motion for a writ of mandate. El Dorado appeals.

## ISSUES

El Dorado contends the trial court erred in denying its motion because the City's imposition of the three further conditions exceeded the City's authority. El Dorado argues that its application for subdivision is governed by section 66427.5. It relies on subdivision (d) of that section, which states, in part, that the scope of the City Council's hearing is limited

---

[1]Unless otherwise indicated, all further statutory references are to the Government Code.

to the issue of compliance with the requirements of that section. Second, El Dorado renews its argument that its application was deemed approved because the City Council failed to act within the statutory time. There being no factual dispute, we agree with El Dorado that these questions are questions of law subject to our independent review. (*County Mobilehome Positive Action Com., Inc. v. County of San Diego* (1998) 62 Cal.App.4th 727, 733 [73 Cal.Rptr.2d 409].)

The City justifies its imposition of further conditions by relying on section 66427.4, subdivision (c), which authorizes the City Council to "require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park." The City argues that this section requires it to impose reasonable conditions of approval and that it did so in a timely manner.

The issue presented by these arguments is whether section 66427.4 or section 66427.5 is applicable to the proposed conversion of the mobilehome park from a rental mobilehome park to a resident-owned park. In resolving this question, El Dorado contends that the words of the statutes are dispositive, while respondents rely on the legislative history of the 1991 and 1995 amendments to these sections.

Intervener El Dorado Mobile Country Club Homeowners Association (Association) was granted leave to intervene as the representative of the homeowners and tenants living in the mobilehome park.[2] It relies on extensive legislative history to argue that section 66427.5 applies only to resident-owned parks, i.e., parks more than 50 percent owned by residents. Accordingly, it argues that El Dorado's application was properly processed under section 66427.4, and the conditions of approval were properly imposed. The Association further contends that a park owner must disclose the proposed purchase price to comply with section 66427.5, and the park owner cannot force conversion on unwilling tenant/purchasers, particularly if the conversion is designed to avoid a local rent control ordinance. The Association also agrees with the City that there was no deemed approval of El Dorado's application.

Amici curiae are organizations involved in the conversion of mobilehome parks to resident ownership. They agree with El Dorado that El Dorado's application is governed by section 66427.5. They argue that the section

[2]It should be noted that the homeowners association is not an entity established pursuant to a declaration of conditions, covenants and restrictions. Instead, it is simply the representative of persons who rent mobilehome spaces in the park.

applies to all conversions of mobilehome parks to resident ownership, no matter who initiates the conversion process. Further, they argue that conversion occurs when the first subdivided unit is sold. The import of this argument is that the City's rent control ordinance would cease to control rents in the mobilehome park as soon as the first sale occurred.

El Dorado and the tenants have a long history of litigation and mutual distrust.[3] Thus, despite certain statutory incentives for the purchase of mobilehome parks by nonprofit organizations,[4] the mobilehome owners here oppose the conversion, contending that they do not have enough information to decide whether to purchase or not, and the proposed conversion is merely a sham to avoid the City's rent control ordinance. Thus, although the Legislature enacted the Mobilehome Park Purchase Fund to provide supplemental funding to encourage and assist mobilehome park residents to purchase the mobilehome parks and convert them to resident ownership (Health & Saf. Code, § 50780, subd. (a)), this appears to be the first case in which the park owner has attempted to convert a park to resident ownership despite the opposition of the park residents.

## THE STATUTORY SCHEME

The Mobilehome Residency Law (Civ. Code, § 798 et seq.) governs tenancies in mobilehome parks, but many other statutes regulate or affect mobilehome parks, their tenancies, and their sale or conversion. (See, e.g., Mobilehomes—Manufactured Housing Act of 1980 [Health & Saf. Code, § 18000 et seq.]; Mobilehome Parks Act [Health & Saf. Code, § 18200 et seq.]; Mobilehome Park Purchase Fund [Health & Saf. Code, § 50780 et seq.], and general provisions relating to sale of subdivided property [Bus. & Prof. Code, § 11000 et seq.].)

The focus here is on the Subdivision Map Act (§ 66410 et seq.) because the mobilehome park owner is seeking to subdivide its park into individual parcels in order to sell the 377 individual mobilehome sites to the persons

---

[3]By order filed August 16, 2001, we took judicial notice of our records of the prior litigation, including case Nos. E011072, E010773, E011103, E011126, E011682, and E017518. See also *El Dorado Palm Springs, Ltd. v. Rent Review Com.* (1991) 230 Cal.App.3d 335 [281 Cal.Rptr. 327].

[4]See, e.g., Health and Safety Code section 50780 et seq. (Mobilehome Park Purchase Fund); and Revenue and Taxation Code section 23701v (exemption from corporation tax law for nonprofit organization formed to purchase mobilehome park to convert it to condominium interests). Amicus Associates Group for Affordable Housing, Inc., describes itself as a "non-profit corporation which was formed to . . . assist[] in achieving the goal of resident ownership of mobilehome parks by acting as subdivider or, in some cases, holding parks for the benefit of residents until the park can be 'converted' and sold to the residents."

who now rent those sites, or others, in order to convert the mobilehome park to a resident-owned condominium mobilehome park. Under section 66424 a "subdivision" includes the division of a parcel for a condominium project, as defined in the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.; see Civ. Code, § 1351, subd. (f).). Thus, El Dorado was required to file a tentative subdivision map with the City, and the City had to approve the tentative subdivision map. (§ 66426.)

The sections at issue here, 66427.4 and 66427.5, are part of a general article relating to subdivision maps. (§ 66425 et seq.) They deal with the conversion of mobilehome parks to other uses and conversion to a condominium form of resident ownership. Sections 66427.1 and 66427.2 deal with the more general subject of conversion of residential real property into condominiums. Section 66428 provides for the waiver of the requirement of filing tentative and parcel maps in certain situations. Section 66428.1 provides that, in the case of conversion of a mobilehome park, the requirement for a parcel map or a tentative and final map may be waived when two-thirds of the owners of mobilehomes in the park sign a petition indicating their intent to purchase the mobilehome park for purposes of converting it to residential ownership.

After the subdivision is approved by local government, the Department of Real Estate regulates the marketing and sale of the individual units in the park. (Bus. & Prof. Code, § 11010 et seq.) It is illegal to sell subdivided property before obtaining a public report from the Real Estate Commissioner. (Bus. & Prof. Code, § 11018.2.)

### INTERPRETATION OF THE STATUTES

1. *General Principles of Statutory Construction.*

■ The statutory context is important because "we must avoid if possible repeals by implication, give effect and significance to every word and phrase of a statute, and construe every statute in the context of the ' " 'entire scheme of law of which it is a part so that the whole may be harmonized and retain effectiveness.' " ' [Citations.]" (*N. T. Hill Inc. v. City of Fresno* (1999) 72 Cal.App.4th 977, 990 [85 Cal.Rptr.2d 562].)

El Dorado relies on the second principle of statutory construction stated in *N. T. Hill*: "[T]he 'plain and commonsense' meaning of the statutory language controls. [Citation.]" (*N. T. Hill Inc. v. City of Fresno, supra,* 72 Cal.App.4th 977, 988.) In the case cited in *N. T. Hill*, our Supreme Court also applied another relevant principle of statutory construction: "If we can

reasonably harmonize '[t]wo statutes dealing with the same subject,' then we must give 'concurrent effect' to both, 'even though one is specific and the other general. [Citations.]' [Citation.]" (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

As our Supreme Court has said in another recent case: "As with any statutory construction inquiry, we must look first to the language of the statute. 'To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent.' [Citation.] If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. [Citation.] 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.]" (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)

2. *Section 66427.4.*

■ We first examine section 66427.4.[5] It applies to "conversion of a mobilehome park to another use." Conversely, it would not apply to conversion of a mobilehome park when the property's use as a mobilehome park is unchanged. The section would only apply if the mobilehome park was being converted to a shopping center or another different use of the property. In that situation, there would be "displaced mobilehome park residents" who would need to find "adequate space in a mobilehome park" for their mobilehomes and themselves. Thus, an impact report is required.[6]

Our conclusion that section 66427.4 applies only when a mobilehome park is converted to other land uses is fortified by the plain language of

---

[5]Section 66427.4 states: "(a) *At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a mobilehome park to another use,* the subdivider shall also file a report on the impact of the conversion upon the displaced residents of the mobilehome park to be converted. In determining the impact of the conversion on displaced mobilehome park residents, the report shall address the availability of adequate replacement space in mobilehome parks. [¶] (b) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body. [¶] (c) The legislative body, or an advisory agency which is authorized by local ordinance to approve, conditionally approve, or disapprove the map, may require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park. [¶] (d) *This section establishes a minimum standard for local regulation of conversions of mobilehome parks into other uses* and shall not prevent a local agency from enacting more stringent measures. [¶] (e) *This section shall not be applicable to a subdivision which is created from the conversion of a rental mobilehome park to resident ownership.*" (Italics added.)

[6]Amici curiae differentiate between a tenant relocation report, which is allegedly required under section 66427.4, and a tenant impact report, which is allegedly required under section

subdivision (e): "This section shall not be applicable to a subdivision which is created from the conversion of a rental mobilehome park to resident ownership."

The City argues that section 66427.4 applies to landlord-initiated conversions while section 66427.5 applies to resident-initiated conversions. The problem with this argument is that the statute does not make this distinction, and such an interpretation is specifically foreclosed by subdivision (e). As El Dorado points out, both statutes use the term "subdivider," and that term is specifically defined by the Subdivision Map Act to mean the person or entity "who proposes to divide . . . real property into a subdivision for himself or for others . . . ." (§ 66423.) We agree with El Dorado: "There is simply no basis for arguing that 'subdivider' means 'resident organization' in Section 66427.5 and 'park owner' in Section 66427.4." The City agrees that the owner is the subdivider under the Subdivision Map Act.

The Association argues that section 66427.5 applies only to resident-owned parks, while section 66427.4 applies to all other changes in use. It relies on the legislative history. Although we discuss the legislative history of section 66427.5 below, we conclude that we do not need to resort to the legislative history in the interpretation of section 66427.4 because the language of section 66427.4, subdivision (e) is clear and dispositive.

The problem with the Association's contention that section 66427.4 applies is that a change in form of ownership is not a change in use. After the change of ownership, the mobilehome park will remain a mobilehome park. Since section 66427.4 applies to changes in use, it is inapplicable here. As noted above, this conclusion is specifically confirmed by subdivision (e).

In other words, the respondents' arguments simply ignore subdivision (e) of section 66427.4 and attempt to write it out of the statute, contrary to the well-established rules of statutory interpretation discussed above.

Although not argued by the City or the Association, a contrary argument could be constructed by application of the definition of "change of use" in the Mobilehome Residency Law. (Civ. Code, § 798 et seq.) That statute defines "change of use" to include "a change of the park or any portion thereof to a condominium, stock cooperative, planned unit development, or

66427.5. However, section 66427.4 uses the term "a report on the impact of the conversion upon the displaced residents of the mobilehome park to be converted." (§ 66427.4, subd. (a).) Section 66427.5 requires a "report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest." (§ 66427.5, subd. (b).) The statutory language does not support the distinction urged by amici curiae.

any form of ownership wherein spaces within the park are to be sold."[7] (Civ. Code, § 798.10.) However, we decline to apply that broad definition to the Subdivision Map Act, as the Mobilehome Residency Law specifically states: "Unless the provisions or context otherwise requires, the following definitions shall govern the construction of this chapter." (Civ. Code, § 798.1.)[8]

Instead, we harmonize sections 66427.4 and 66427.5 by applying section 66427.4 to changes of use which displace the existing park residents and require relocation of the mobilehomes because the subdivider is converting the property to a nonmobilehome park use. Under this interpretation, section 66427.5 applies to subdivisions created to convert a rental mobilehome park to a resident-owned mobilehome park.

We therefore conclude that section 66427.4 does not support the Association's argument, and it is inapplicable to justify the three further conditions imposed on El Dorado by the City. The plain meaning of section 66427.4 is that it applies only when a mobilehome park is converted to other land uses, thus requiring the residents and their mobilehomes to be relocated.

3. *Section 66427.5.*

Section 66427.5 applies to "the conversion of a rental mobilehome park to resident ownership . . . ."[9] As the portions emphasized in the footnote indicate, the City Council, in acting on El Dorado's application for approval

---

[7] The section also defines "change of use" more conventionally: " 'Change of use' means a use of the park for a purpose other than the rental, or the holding out for rent, of two or more mobilehome sites to accommodate mobilehomes used for human habitation, and does not mean the adoption, amendment, or repeal of a park rule or regulation."

[8] Indeed, it appears from the legislative history that subdivision (e) was added to foreclose just such an argument.

[9] Section 66427.5 states: "*At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership,* the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner: [¶] (a) The subdivider shall offer each existing tenant an option to either purchase his or her condominium or subdivided unit, which is to be created by the conversion of the park to resident ownership, or to continue residency as a tenant. [¶] (b) The subdivider shall file a report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest. [¶] (c) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body. [¶] (d) The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. *The scope of the hearing shall be limited to the issue of compliance with this section.* The subdivider shall be required to avoid the economic displacement of all nonpurchasing residents in accordance with the following: [¶] (1) As to nonpurchasing residents who are not lower income households, as defined in Section 50079.5 of the Health

of the tentative subdivision map, only had the power to determine if El Dorado had complied with the requirements of the section. (§ 66427.5, subd. (d).) It therefore had no power to impose the three further mitigating conditions on El Dorado.

The City and the Association rely on the only published case interpreting section 66427.5. In *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168 [55 Cal.Rptr.2d 282], the court held that "section 66427.5 applies only *after* a rental park is converted to resident ownership." (*Donohue,* at p. 1173, italics added.)

In *Donohue,* the mobilehome park residents had tried in 1991 to convert the mobilehome park from a rental park to residential ownership. (*Donohue v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1173.) A tentative subdivision map was filed with the City of Santa Paula in June 1992, but the conversion failed because the owners were unable to obtain the necessary financing. (*Ibid.*) In November 1992, the city voters adopted an initiative rent control ordinance applicable to mobilehome park space rents. In 1994, the park owner raised rents by 12 percent, contending that "rents at the Park were controlled by section 66427.5 rather than the initiative because a tentative map to convert the Park had been filed." (*Donohue,* at p. 1173.)

The trial court found that section 66427.5 applies "whenever a subdivider files a tentative map to convert a rental park to resident ownership, even if the conversion does not occur." (*Donohue v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1172.) The appellate court disagreed, holding that section 66427.5 applies only after a rental park is converted to resident ownership.

The appellate court was concerned about the possibility of using section 66427.5 to evade local rent control provisions: "Under respondents' theory, section 66427.5 applies as soon as a subdivider files a tentative map to convert to resident ownership, regardless of whether conversion actually

and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent to market levels, as defined in an appraisal conducted in accordance with nationally recognized professional appraisal standards, in equal annual increases over a four-year period. [¶] (2) As to nonpurchasing residents who are lower income households, as defined in Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period." (Italics added.)

occurs. . . . [I]f respondents are correct, every park owner could purchase a lifetime exemption from local rent control for the cost of filing a tentative map, even if park residents have no ability to purchase and even if local government disapproves the tentative map. Park residents could then be economically displaced by unregulated rent increases. This is the very circumstance section 66427.5 was enacted to prevent." (*Donohue v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1175.)

We are equally concerned about the use of the section to avoid local rent control, especially since the section does not state when the rent control phaseout in section 66427.5, subdivision (d) becomes applicable, and it provides no time limits for the completion of the conversion. The City is also concerned that there could be an abuse of the conversion process: "Under the argument of *Amicus,* Appellant could simply purchase one of the newly created subdivided units, price of [*sic*] the remaining units at prohibitively expensive amounts, and obtain for himself a 'life time exemption' from Palm Springs Rent Control ordinances." The City argues that it imposed the date of conversion requirement because it did not believe that the sale of a single subdivided unit should allow the park owner to escape the requirements of its rent control ordinance.

At oral argument, the City argued that the three further conditions it imposed were designed to prevent an abuse of the conversion process by a developer who was engaged in a sham or fraudulent transaction which was intended to avoid the rent control ordinance. The problem with the argument is that section 66427.5, subdivision (d) provides that "The scope of the hearing shall be limited to the issue of compliance with this section." Thus, the City lacks authority to investigate or impose additional conditions to prevent sham or fraudulent transactions at the time it approves the tentative or parcel map. Although the lack of such authority may be a legislative oversight, and although it might be desirable for the Legislature to broaden the City's authority, it has not done so. We therefore agree with appellant that the argument that the Legislature should have done more to prevent partial conversions or sham transactions is a legislative issue, not a legal one. In any event, as noted below, *Donohue* illustrates the point that the courts will not apply section 66427.5 to sham or failed transactions, or to avoid a local rent control ordinance.

We agree with *Donohue* that the rent control phaseout provisions of section 66427.5, subdivision (d) do not apply as soon as a tentative map application is filed. As *Donohue* states, subdivision (d) cannot apply to avoid the economic displacement of nonpurchasing residents before there are any

such residents, nor would it make any sense to allow an increase from preconversion rents before there was a conversion. (*Donohue v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1175-1176.)

Section 66427.5 applies after a rental mobilehome park is converted to resident ownership. (*Donohue v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1173.) As discussed further below, conversion occurs on the date that the first subdivided unit is sold. If, as in *Donohue,* conversion fails and no units are ever sold, section 66427.5 cannot be used to evade a local rent control ordinance. We also agree with *Donohue* that the section may not be used to justify preemption of a local rent control ordinance if the conversion is unsuccessful.[10] However, in the normal situation in which conversion proceeds in accordance with the statutory requirements, section 66427.5 becomes applicable to protect nonpurchasing residents as soon as the first unit is sold.

As discussed below, the legislative purpose was to avoid economic displacement of nonpurchasing residents. Section 66427.5, subdivision (a) carries out this purpose by requiring the subdivider to offer each existing tenant the option to either purchase their subdivided unit or to remain as a tenant. Under subdivision (b), the subdivider must give each resident a copy of the report detailing the impact of the conversion upon residents. Finally, the subdivider "shall be required to avoid the economic displacement of all nonpurchasing residents" by increasing rents to market levels over a four-year phaseout period. These steps must necessarily be taken as part of the conversion process.

 Since section 66427.5 applies to the conversion of a rental mobilehome park to resident ownership, and since that section limits the power of the City Council to a determination of whether the subdivider has complied with the provisions of the section, we agree with El Dorado that the City Council lacked the authority to condition approval on imposition of the three further mitigation conditions described above.

### The Legislative History

The *Donohue* court did not consider the legislative history, relying instead on the language of the statute itself to determine legislative intent. (*Donohue*

---

[10]As respondents point out, the statute does not specifically protect against sham or failed transactions in which a single unit is sold, but no others, and the park owner then claims a local rent control ordinance is preempted by section 66427.5, subdivision (d). However, as *Donohue* illustrates, the courts will not apply section 66427.5 to sham or unsuccessful conversions.

*v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1174-1175.) Here, the parties discuss the legislative history in some detail, and respondents contend that the legislative history supports their interpretation of the statute.

■ Initially, we are faced with the question of whether we should examine the legislative history at all: "Only when the language of a statute is susceptible to more than one reasonable construction is it appropriate to turn to extrinsic aids, including the legislative history of the measure, to ascertain its meaning. [Citation.]" (*Diamond Multimedia Systems, Inc. v. Superior Court, supra,* 19 Cal.4th 1036, 1055.)

Although we have not found any such ambiguity as to section 66427.4, the City and the Association contend that section 66427.5 is ambiguous and inapplicable, and they rely heavily on the legislative history of the 1991 and 1995 amendments to that section. Although we find little ambiguity, it is proper to consider legislative history "where it buttresses our interpretation of the plain meaning of a statute. [Citation.]" (*Jenkins v. County of Los Angeles* (1999) 74 Cal.App.4th 524, 530 [88 Cal.Rptr.2d 149], citing *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Accordingly, we will briefly review the legislative history of section 66427.5.[11]

### 1. *The 1991 enactment of Section 66427.5.*

■ Section 66427.5 was added in 1991. (Stats. 1991, ch. 745, § 2, p. 3324.) At that time, the introductory phrase of section 66427.5 read: "At the time of filing a tentative or parcel map for a subdivision to be created using financing or funds provided pursuant to Chapter 11 (commencing with Section 50780) of Part 2 of Division 31 of the Health and Safety Code, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner . . . ."

The Association maintains that the section applied only to conversion of mobilehome parks by resident organizations who were using financing from the Mobilehome Park Purchase Fund. It cites the third reading analysis prepared by the Office of Senate Floor Analyses: " 'This bill amends Subdivision Map Act requirements relating to conversion of a mobilehome park <u>by a resident organization</u> and amends displacement requirements for <u>Mobilehome Park Purchase Fund</u>.' " This analysis by the Office of Senate Floor

---

[11]The City filed a legislative history of the 1991 and 1995 legislation prepared by Legislative Intent Service with the trial court. Unless otherwise indicated, we refer to our record for the legislative history discussed in this section.

Analyses is relevant to the issue of legislative intent. (*Southland Mechanical Constructors Corp. v. Nixen* (1981) 119 Cal.App.3d 417 [173 Cal.Rptr. 917].)

The Legislative Counsel's Digest of the final Assembly Bill No. 1863 states: "This bill would require subdividers to offer each existing tenant an option to purchase his or her condominium unit which is to be created by the conversion of the park into condominium interests or to continue residency as a tenant. In the event the tenant elects to continue residency in a condominium conversion made pursuant to the Mobilehome Park Purchase program, administered by the Department of Housing and Community Development, a procedure would be applicable requiring the subdivider to avoid the economic displacement of all nonpurchasing residents of these parks. The bill would set the allowable rate of increase in monthly rent for nonpurchasing residents of these parks, specifying alternative procedures for nonpurchasing residents who are, or are not, lower income households, as defined." (Legis. Counsel's Dig., Assem. Bill No. 1863 (1991-1992 Reg. Sess.) 4 Stats. 1991, Summary Dig., p. 311.)

■ It is proper for us to consider the Legislative Counsel's analysis of a bill as evidence of legislative intent, although it is not controlling. (*People v. Turner* (1995) 40 Cal.App.4th 733, 741 [47 Cal.Rptr.2d 42]; *Stewart v. Board of Medical Quality Assurance* (1978) 80 Cal.App.3d 172 [143 Cal.Rptr. 641].) As our Supreme Court has observed: "While an opinion of the Legislative Counsel is entitled to respect, its weight depends on the reasons given in its support." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 238 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

■ From these and other provisions it is clear that the bill was designed, among other things, to provide economic displacement protections to nonpurchasing owners when the condominium conversion was made pursuant to the mobilehome park purchase program. The bill also amended Health and Safety Code section 50786, which is part of the purchase program. The purchase program itself contains a declaration of legislative intent: "[I]t is the intent of the Legislature, in enacting this chapter, to encourage and facilitate the conversion of mobilehome parks to resident ownership or ownership by qualified nonprofit housing sponsors or by local public entities, to protect low-income mobilehome park residents from both physical and economic displacement, to obtain a high level of private and other public financing for mobilehome park conversions, and to help establish acceptance for resident-owned, nonprofit-owned, and government-owned

mobilehome parks in the private market." (Health & Saf. Code, § 50780, subd. (b).)

It is therefore evident that, under the law in effect prior to 1995, section 66427.5 referred to mobilehome park conversions made by residents or nonprofit organizations under the Mobile Home Purchase Fund.[12] El Dorado does not disagree with this analysis, but rather contends that the system changed with the 1995 enactment of Senate Bill No. 310. We therefore turn to that subject.

2. *The 1995 Amendment to Section 66427.5.*

Senate Bill No. 310, enacted in 1995, amended section 66427.5. First, it replaced the introductory phrase quoted above with a new introductory phrase: "At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner: . . ." (Stats 1995, ch. 256, § 5.) It also added a new subdivision (a), relating to options to tenants to purchase, a new subdivision (b), requiring an impact report, and the introductory provisions of subdivision (d), relating to a hearing to establish compliance with the section.

El Dorado contends that these changes were intended to apply the mitigation provisions to all mobilehome park subdivisions, thereby making the law uniform and eliminating the previous distinctions between tenant-sponsored and owner-sponsored conversions.

El Dorado cites portions of the legislative history in support of its argument. First, it cites the Legislative Counsel's Digest for the bill. Immediately following the paragraph describing existing law quoted in footnote 12, *ante*, the digest states: "This bill would replace the reference to subdivisions from the specified funding source with a reference to subdivisions created from the conversion of a rental mobilehome park to resident ownership, and would add further requirements for avoiding economic displacement of nonpurchasing residents, including requiring that the subdivider be

---

[12]The Legislative Counsel's Digest of Senate Bill No. 310, enacted in 1995, describes the existing law in this regard as follows: "Existing law regulates mobilehome parks in various capacities, including requiring a subdivider, at the time of filing a tentative or parcel map for a subdivision to be created using financing or funds from a specified source, to avoid the economic displacement of nonpurchasing residents, as specified, and file a report, as specified, regarding the impact of the conversion upon the displaced residents of the mobilehome park to be converted. Existing law also requires a subdivider to offer each existing tenant the option to purchase his or her condominium unit, which is to be created by conversion of a mobilehome park into condominium units." (Legis. Counsel's Dig., Sen. Bill No. 310 (1995-1996 Reg. Sess.) Stats. 1995, ch. 256.)

subject to a hearing on the matter, as specified." (Legis. Counsel's Dig., Sen. Bill No. 310 (1995-1996 Reg. Sess.) Stats. 1995, ch. 256.)

Second, El Dorado cites the Assembly Committee report on Senate Bill No. 310: "This bill: [¶] . . . [¶] [d]eletes the reference to MPROP [Mobilehome Park Resident Ownership Program] with respect to the statutory mitigation scheme . . . *thereby making these mitigation provisions applicable to all mobilehome park conversions.*" (Assem. Com. on Housing and Community Development, Rep. on Sen. Bill No. 310 (1995-1996 Reg. Sess.) as amended June 13, 1995, italics added.)

Third, El Dorado cites an analysis prepared by the Office of Senate Floor Analyses, prepared for the Senate Rules Committee: "The bill deletes the reference to the Mobilehome Park Resident Ownership Program with respect to the statutory mitigation scheme, thereby making these mitigation provisions applicable to all subdivided mobilehome park conversions." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 310 (1995-1996 Reg. Sess.) as amended June 13, 1995.)

Other portions of the legislative history in our record support El Dorado's position. A report for the Senate Housing and Land Use Committee: "Existing law requires a subdivider to avoid economic displacement of nonpurchasing residents when Mobilehome Park Purchase Funds are used to convert a mobilehome park. The law limits rent increases that the subdivider can charge nonpurchasing residents that remain in the park. Senate Bill 310 requires all subdividers to mitigate the economic displacement of all nonpurchasing residents by allowing payment of rent increases in five annual payments."[13] (Sen. Com. on Housing and Land Use, Rep. on Sen. Bill No. 310 (1995-1996 Reg. Sess.) Mar. 16, 1995, italics omitted.)

A bill analysis prepared by the Senate Select Committee on Mobilehomes states: "SB 310 would establish the 1992 section [§ 66427.5], apart from conversion of the park to other types of subdivided uses, as the sole means for local government to determine mitigation requirements for all conversions of parks to resident-owned subdivided interests, not just those financed by MPROP." (Sen. Select Com. on Mobile and Manufactured Homes, Analysis of Sen. Bill No. 310 (1995-1996 Reg. Sess.) as amended June 13, 1995.)

The City makes a contrary argument by pointing to the deletion, in the legislative process, of a proposed subdivision (e) to section 66427.5: "This

---

[13]As enacted, the section provides for equal annual increases over a four-year period. (§ 66427.5, subd. (d)(1).)

section establishes a statewide standard for regulation of the conversion of mobilehome parks to residential ownership uses. No local agency shall enact more stringent measures pertaining to regulation of the conversion of mobilehome parks to residential ownership uses."[14] This deletion allowed the bill to obtain the support of the League of California Cities.

■ The City relies on the well-established rule that deletion of a provision is persuasive evidence that the Legislature did not intend to adopt it, and the final statute should not be construed to include the omitted provision. (*Beverly v. Anderson* (1999) 76 Cal.App.4th 480, 485-486 [90 Cal.Rptr.2d 545].)

■ We do not find the City's argument persuasive. At the time subdivision (e) was deleted from section 66427.5, subdivision (e) was added to section 66427.4: "This section shall not be applicable to a subdivision which is created from the conversion of a rental mobilehome park to resident ownership." It therefore appears that the Legislature merely expressed the same thought in a different way. It made it clear that section 66427.4, which allows local government to impose additional mitigation provisions, was inapplicable instead of stating that section 66427.5 was applicable.[15] As El Dorado points out, the analysis in the *Beverly* case turned on whether other language was inserted that was comparable to the deleted provision. It states: "As we have seen, section 29853.5 as enacted contains nothing corresponding to the deleted provision. Therefore we conclude that the Legislature intended no such provision to be judicially grafted onto the statute. [Citations.]" (*Beverly v. Anderson, supra,* 76 Cal.App.4th 480, 486.) Here, there was a corresponding provision, and the principle applied in *Beverly* does not govern.

Despite what we find to be rather clear evidence of legislative intent, the Association continues to argue that section 66427.5 only applies to conversion to a resident-owned park. It attributes a special meaning to that phrase

---

[14]Subdivision (e) was first added in the Senate by a March 27, 1995, amendment. It was in the Senate bill as passed, but was deleted by an Assembly amendment on June 13, 1995, and section 66427.4, subdivision (e) was added. The Assembly made "numerous substantive and technical changes; however, the intent remains the same." The Senate concurred in the Assembly amendments.

[15]The City also finds support for its position in a Senate third reading report. However, the portion of that report which it quotes is a provision describing *existing* law. The following page states the change in the law to be made by Senate Bill No. 310: "This bill: [¶] . . . [¶] [c]larifies that the power to require mitigation measures, with respect to displaced residents, by a legislative body when a park is converted to another use . . . is not applicable to a park converted to resident ownership." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 310 (1995-1996 Reg. Sess.) as amended June 13, 1995.)

by citing the definition of "resident ownership" in the Mobilehome Park Purchase Fund law. That definition states: " 'Resident ownership' means, depending on the context, either the ownership by a resident organization of an interest in a mobilehome park that entitles the resident organization to control the operations of the mobilehome park for a term of no less than 15 years, or the ownership of individual interests in a mobilehome park, or both." (Health & Saf. Code, § 50781, subd. (m).) The Association argues that resident ownership of the park, and control of operations of the park, can only occur when the purchasing residents have the ability to control, manage and own the common facilities in the park, i.e., when 50 percent plus 1 of the lots have been purchased by the residents.[16] Thus, the Association would only apply section 66427.5 after the rental mobilehome park has been successfully converted to resident ownership by sale of more than 50 percent of the lots.

Of course, the Association's interpretation would eliminate any economic displacement protection for persons displaced prior to the sale of more than 50 percent of the lots. The interpretation thus fails to acknowledge that this protection applies to "all nonpurchasing residents." (§ 66427.5, subd. (d).) The Association's interpretation therefore contradicts the clear statutory language, and the legislative intent, to protect all such persons.

The Association's interpretation would conflict with the legislative intent to encourage such conversions. Indeed, even the City notes that "such an onerous condition of approval would effectively give the mobile home park homeowners' association the ability to unilaterally block the proposed park conversion unless the landlord would otherwise set his purchase price at an amount acceptable to the homeowners." Giving the homeowners this power would conflict with the legislative intent "to encourage and facilitate the conversion of mobilehome parks to resident ownership . . . ." (Health & Saf. Code, § 50780, subd. (b).)

Equally important is the Legislature's intention, in enacting Senate Bill No. 310, to broaden the protection of mobilehome park residents from economic displacement to all conversions of rental mobilehome parks to resident ownership, not just conversions financed by use of the Mobilehome Park Purchase Fund.

Finally, even if we were to apply the definition of "resident owner" in Health and Safety Code section 50781, subdivision (m), it is clear from the

---

[16]The Association quotes a purported municipal ordinance of the City of Union City which so provides. It is of no value as authority for the Association's argument.

definition quoted above that the term "resident owner" includes the usual meaning of the words: i.e., "the ownership of individual interests in a mobilehome park . . . ." The Association's selective quoting of the definition to fit its argument is not helpful. We therefore conclude that the term "resident ownership" as used in section 66427.5 means just what it says: the statute applies to all conversions of mobilehome parks to resident ownership.

We therefore reject the Association's legislative intent argument that concludes that section 66427.5 is inapplicable until more than 50 percent of the park's units are sold to the residents.

In further support of their arguments, the City and the Association cite and liberally quote from a letter dated June 19, 2000, from John Tennyson, a consultant to the California State Senate Select Committee on Mobile and Manufactured Homes. That letter is not part of the Legislative Intent Service materials in our record. It was submitted as an exhibit to the Association's memorandum of points and authorities in opposition to the petition for writ of mandate.

Mr. Tennyson's letter purports to discuss the legislative intent of the 1995 amendment to section 66427.5, or, more accurately, a lack of intent: "There was never any intent that [section 66427.5] could be used by a parkowner other than in the context of a bonafide resident conversion." (John Tennyson, consultant, letter to Sen. Select Com. on Mobile and Manufactured Homes, June 19, 2000.)

We decline to consider the letter as evidence of the Legislature's intent when it adopted the 1995 amendments. ■ It is well settled that individual opinions of legislators or staff members merely reflect their individual opinions, and are not probative of the collegial intent of the Legislature at the time the bill was passed. (*People v. Patterson* (1999) 72 Cal.App.4th 438, 443 [84 Cal.Rptr.2d 870].) "Material showing the motive or understanding of an individual legislator, including the bill's author, his or her staff, or other interested persons, is generally not considered. [Citations.] This is because such materials are generally not evidence of the Legislature's *collective* intent. [Citations.]" (*Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1426 [96 Cal.Rptr.2d 314].)

In addition, the subject letter was written five years after enactment of the amendment, and is addressed to an attorney, presumably for use in this litigation. Such post hoc materials are not evidence of legislative intent. (*People v. Patterson, supra,* 72 Cal.App.4th 438, 444; *Harris v. Capital*

*Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157-1158, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873].) "A postenactment statement by a person who was not even a member of the Legislature, such as Senator Keene's staff member, apart from its inadmissibility, is entitled to virtually no weight. [Citations.]" (*Haworth v. Lira* (1991) 232 Cal.App.3d 1362, 1369 [284 Cal.Rptr. 62].) We therefore disregard the statements by Mr. Tennyson.[17]

█ We therefore conclude that the legislative history does not support the Association's contention that section 66427.5 applies only to resident-owned parks, defined as parks with more than 50 percent resident ownership. To the contrary, we conclude that section 66427.5 applies to *all* subdivisions "to be created from the conversion of a rental mobilehome park to resident ownership . . . ." (§ 66427.5.)

OTHER ISSUES

El Dorado requests that, if we find section 66427.5 applicable (as we have), we reverse and remand to the trial court with directions to the trial court to issue a peremptory writ of mandate directing the City to approve the application without the three further conditions. It would therefore argue that consideration of any other issues is unnecessary to our decision.

We disagree because section 66427.5 requires the City Council to determine whether the subdivider has complied with section 66427.5. It has not yet done so, and we think it proper to remand the case to the trial court to require the City Council to make that determination before the trial court considers issuing a peremptory writ ordering approval of the application.

The parties have anticipated our conclusion that section 66427.5 applies to El Dorado's application for tentative map approval, and that section 66427.4 does not, and they have raised three other issues that arise as the result of this conclusion.

Before considering these issues, we anticipate El Dorado's argument that there should be no further consideration of the issue by the City Council because its application for tentative map approval has already been approved by operation of law. If El Dorado is correct, no further discussion of the other issues would be necessary.

---

[17]Even if we considered the letter, there is no evidence that El Dorado's filing of an application for approval of a tentative parcel map is not the beginning of a bona fide conversion to resident ownership, notwithstanding the suspicions of the Association.

## 1. *El Dorado's Deemed Approval Argument.*

El Dorado contends that its application was approved by operation of law because the City failed to take timely action on it. Section 66452.4 provides for such deemed approval when the local legislative body fails to approve, conditionally approve, or disapprove the application within the time limits set forth in the Subdivision Map Act procedural provisions. (§ 66451 et seq.) The parties agree that July 5, 2000, was the last day for the City Council to take action. However, the parties disagree on what happened at a hearing which was held on that day.

El Dorado contends that the City Council failed to take final action on the application and merely continued the matter until July 19, 2000, without its consent. The City and the Association contend that the City Council denied the application on that date and ordered a new denial motion prepared with findings.

The relevant facts are that the matter was heard on July 5, 2000. The minutes of the meeting begin with the staff's recommendation that the tentative tract map be approved with conditions. After the hearing was closed to public comments, the council members discussed the application. The minutes then state: "Motion to deny the Resolution based on not offering meaningful protection from the impacts of conversion was presented; after which, it was moved by Oden, seconded by Hodges, and carried by the following vote that the Resolution be denied, and that staff be directed to reformulate a new Resolution with findings for denial of the Tract Map." The minutes further reflect that the resolution passed by a four-to-one vote. Although the minutes are unclear, it appears that the resolution referred to was the staff recommendation for approval of the tract map.

We therefore turn to the transcript for clarification. It reflects that the staff presented a report recommending conditions of approval, and that the city attorney then stated: "The action that is being recommended to be taken tonight by the council is approval of a resolution approving the action of the city council approving the tentative tract map with conditions." After the council discussion, Councilman Oden made a motion "to deny the resolution on the basis that it does not offer the meaningful protections for non-purchasing residents from the impacts of the conversion." After further discussion, the city attorney said: "If the council action is to support this motion, I would request that the motion be modified somewhat to be directory to us to prepare a Resolution of Denial; and in that resolution, we would incorporate as best we can the information that's been presented and

what we believe the reasoning of the council would be, and we would bring that resolution back at your next meeting for action. So I think we need a resolution incorporating appropriate findings." Subsequently, Councilman Oden stated: "Since we have a motion on the floor, I am more than willing to make the adjustment to the recommendation of the . . . city attorney." The seconding councilwoman agreed and the motion was passed by a four-to-one vote.

El Dorado's position that the City Council failed to take final action on the application on July 5th is supported by subsequent events. At a hearing on August 2, 2000, the city attorney summarized the previous hearing as follows: "Last time we reviewed this matter, the council conducted a public hearing and at the conclusion of the hearing, after much discussion, directed us to prepare a resolution denying the project and bringing that back to you. We have prepared that resolution. It's in your agenda packet." A formal resolution was adopted on August 2, 2000. In its introductory clauses, it states: "WHEREAS, at the conclusion of its public hearing on July 5, 2000, the City Council directed City staff to prepare a Resolution of Denial for consideration of the City Council at the regularly scheduled July 19, 2000 City Council meeting . . . ."

However, on balance, we agree with the City that the City Council, at the July 5th meeting, denied the "resolution approving the action of the city council approving the tentative tract map with conditions." Thus, the statutory mandate was met: the appropriate legislative body disapproved the tentative map as filed. (§ 66452.4; see *Carmel Valley View, Ltd. v. Maggini* (1979) 91 Cal.App.3d 318, 322-323 [155 Cal.Rptr. 208].)[18]

The statute does not require that the disapproval be final. (*Carmel Valley View, Ltd. v. Maggini, supra,* 91 Cal.App.3d 318, 322-323.) In fact, the parties were engaged in substantial settlement negotiations prior to the August 2, 2000, council meeting. At that meeting, as noted above, a formal resolution was adopted which reversed the disapproval and approved the tentative map, albeit with the three further conditions that El Dorado finds objectionable.

We therefore conclude that, in this situation, there was no deemed approval of the tentative map under section 66452.4. We therefore turn to the other three issues raised by the parties.

---

[18]The City argues that the relevant time period under the permit streamlining provisions of the Subdivision Map Act never began to run because it did not approve the environmental aspects of the project until August 2, 2000. (See § 66452.2.) We find it unnecessary to consider this alternative argument.

## 2. *Time of Conversion.*

The first issue is when conversion occurs. In *Donohue*, the trial court held that conversion occurs, and section 66427.5 became applicable, "whenever a subdivider files a tentative map to convert a rental park to resident owner-ship, even if the conversion does not occur." (*Donohue v. Santa Paula West Mobile Home Park, supra*, 47 Cal.App.4th 1168, 1172.) The appellate court held the section inapplicable because conversion never occurred. In discussing the statutory language, it read the introductory phrase of the statute ("At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership") to define the time "when the subdivider must offer tenants the option to purchase their space, file and distribute the tenant impact report, and demonstrate to local government that the conversion plan complies with the statute. . . . Thus, the opening phrase of section 66427.5 describes when the subdivider must inform local government of the rent increases it expects to enact after conversion, not the date on which the increases take effect." (*Donohue*, at p. 1176.) The court also points out that the use of the term "preconversion" in section 66427.5, subdivision (d)(1) and (2) "distinguishes between the rent charged before conversion and the rent charged after conversion. Had the Legislature intended to distinguish between the rent charged before a tentative map is filed and the rent charged after filing, it easily could have done so." (*Donohue*, at p. 1176.)

The *Donohue* court gave two further reasons for rejecting the argument that the section applies as soon as a tentative map is filed, regardless of whether the conversion is completed. First, it found that the term "nonpurchasing residents," as used in section 66427.5, subdivision (d)(1) and (2), "only has meaning when applied to a park in which some residents have purchased their spaces and others have not." (*Donohue v. Santa Paula West Mobile Home Park, supra*, 47 Cal.App.4th 1168, 1175.) Second, the court found that, if conversion occurred when the map was filed, the first two sentences of subdivision (d), relating to the local government's authority to hold a hearing to determine compliance with the section, would be futile. (*Donohue*, at p. 1176.)

We agree with *Donohue*'s basic holding that conversion does not occur when the tentative map is filed, and its conclusion that the statute does not apply if conversion never occurs.

In the normal situation, conversion begins with compliance with the Subdivision Map Act, followed by approval from the Department of Real Estate under the Subdivided Lands Act. (Bus. & Prof. Code, § 11000 et seq.)

Although the Subdivision Map Act does not define the conversion process or the time of conversion more fully, we are not without guidance. As El Dorado and amici curiae point out, several cases hold that a condominium conversion occurs when the first unit is sold.

In *City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184 [278 Cal.Rptr. 375, 805 P.2d 329], the city passed an ordinance requiring a conditional use permit for the conversion of apartments into condominiums. The defendants contended they were exempt from the ordinance because, at the time the ordinance was passed, they had secured final subdivision map approval and permission from the Department of Real Estate to sell individual units as condominiums. (*Id.* at p. 1187.) Our Supreme Court concluded that defendants were exempt from the ordinance because the defendants had completed all the steps required before they could sell condominium units. Because they had the right to sell the units, the court found that the city could not impose additional conditions on the sale. (*Id.* at p. 1190.) The court said: "Under the statutory definition of a condominium, therefore, an apartment building is not converted into a condominium project until at least one unit has been conveyed, even if the owner has obtained all the governmental approvals and recorded all the documents necessary to subdivide and sell individual apartments as condominiums. [Citation.] The City concedes that once defendants sell a unit, the conversion is complete and the newly enacted regulations may not be enforced." (*Ibid.*) The court therefore found the decisive date was the date the developer secures final subdivision map approval and permission from the Department of Real Estate to sell units. (*Id.* at p. 1191.) The court also noted that a single conveyance completes the conversion process under Civil Code section 1352. Accordingly, at that time, the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.) becomes applicable.

Amici curiae also cite *County of Los Angeles v. Hartford Acc. & Indem. Co.* (1970) 3 Cal.App.3d 809 [83 Cal.Rptr. 740]. In that case, the developer sought to convert an apartment building into condominiums. The attempt failed, and the county sought to recover on a bond given as a condition to the recording of a final tract map. In discussing the purposes for which the bond was given, the court noted that, under the Civil Code definition of "condominium" (formerly Civ. Code, § 783, now contained in §§ 783 & 1351, subd. (f)), "[t]here can be no undivided interest in common (and thus by statutory definition there can be no condominium) until at least one condominium unit has been conveyed by the subdivider." (*County of Los Angeles,* at p. 814.)

We therefore agree with El Dorado and amici curiae that section 66427.5, which is designed to mitigate the economic effects of conversion on nonpurchasing tenants, must be applicable when the first unit is sold. It appears to

us that the *Donohue* court was referring to this time when it concluded that section 66427.5 applies only after a rental park is converted to resident ownership. At that time, sales begin and the economic mitigation measures for displaced residents specified in section 66427.5, including preemption of a local rent control ordinance, become effective. And, as noted above, the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.) also becomes applicable at that time.

As amici curiae note, "Under no circumstances . . . is it left to local governments to legislate when state law takes effect." If the City were empowered to select a later date, as it did here, the economic displacement protections for nonpurchasing residents would not apply before the selected date. This contradicts the clear legislative intent to protect all nonpurchasing residents. We therefore conclude the City did not have the authority to impose a condition which purports to impose a different date.

3. *Disclosure of Tentative Purchase Price.*

Assuming, arguendo, that section 66427.5 is applicable, the Association argues that it requires the subdivider to disclose both the tentative purchase price for the individual lots and the market rent which will eventually be charged to nonpurchasing residents. The Association relies on *Donohue*'s summary of the statute. That summary states that the introductory paragraph of section 66427.5 requires the subdivider to offer tenants the option to purchase their space and it also "describes when the subdivider must inform local government of the rent increases it expects to enact after conversion . . . ." (*Donohue v. Santa Paula West Mobile Home Park, supra,* 47 Cal.App.4th 1168, 1176.) However, in that passage, the court was merely describing the requirements of the statute. Although a tenant cannot make a rational decision to buy, continue to rent, or move his or her mobilehome unless the tenant is given an option price and a proposed rental price, the tenant is not required to make such a decision until after the Department of Real Estate has approved the project and issued its public report. (Bus. & Prof. Code, § 11010.9.) Under the conditions of approval here, the mobile-home owner is given an exclusive right to purchase his or her unit for six months from the date of issuance of the subdivision public report under Business and Professions Code section 11018.

The Association alleges that El Dorado has not complied with this requirement. Inferentially, it argues that El Dorado's application should therefore have been denied by the City Council because it did not comply with the requirements of section 66427.5.

El Dorado points out that this specific subject was addressed by the enactment of Business and Professions Code section 11010.9 as part of Senate Bill No. 310, discussed above. That section, which is set out in full in the footnote, provides that disclosure of the tentative sales price shall be made prior to filing a notice of intention to sell with the Department of Real Estate.[19] Since that section applies "[n]otwithstanding any other provision of law," we harmonize it with section 66427.5 by finding that the tentative purchase price must be disclosed at the time specified in Business and Professions Code section 11010.9, i.e., at some time prior to the filing of the notice of intention to sell, but that the disclosure need not be made at the time of filing of the application for approval of the tentative map. At the latter time, the subdivider must only notify residents that they will have an option to purchase their sites, or to continue to rent them.[20] While the filing of the application and compliance with section 66427.5 give notice to the residents of their option to purchase, the subdivider does not need to disclose a tentative price at that time because the residents do not need to decide whether to purchase at that time. Indeed, the giving of the disclosure notice does not authorize the subdivider to offer to sell the units before obtaining Department of Real Estate approval. (Bus. & Prof. Code, § 11010.9, subd. (c).)

The Association contends that the legislative history is relevant on the issue of price disclosure. We disagree, finding that the plain meaning of the statutes governs. Even if the legislative history of Senate Bill No. 310 were relevant because of some doubt about legislative intent, it does not help the Association's position.

The Association cites the bill sponsor's letter to the Governor requesting signature of the bill. However, individual statements by bill authors are not

---

[19]Business and Professions Code section 11010.9 states: *"Notwithstanding any other provision of law, the subdivider of a mobilehome park that is proposed to be converted to resident ownership, prior to filing a notice of intention pursuant to Section 11010, shall disclose to homeowners and residents of the park, by written notice, the tentative price of the subdivided interest proposed to be sold or leased.* [¶] (b) The disclosure notice required by subdivision (a) shall include a statement that the tentative price is not binding, could change between the time of disclosure and the time of governmental approval to commence the actual sale or lease of the subdivided interests in the park, as the result of conditions imposed by the state or local government for approval of the park conversion, increased financing costs, or other factors and, in the absence of bad faith, shall not give rise to a claim for liability against the provider of this information. [¶] (c) The disclosure notice required by subdivision (a) shall not be construed to authorize the subdivider of a mobilehome park that is proposed to be converted to resident ownership to offer to sell or lease, sell or lease, or accept money for the sale or lease of, subdivided interests in the park, or to engage in any other activities that are otherwise prohibited, with regard to subdividing the park into ownership interests, *prior to the issuance of a public report pursuant to this chapter.*" (Italics added.)

[20]Although not required, El Dorado agreed that it would not offer the units for sale at a price exceeding their appraised fair market value.

generally admissible as statements of legislative intent. (*Metropolitan Water Dist. v. Imperial Irrigation Dist., supra,* 80 Cal.App.4th 1403, 1426, citing *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 726-727 [80 Cal.Rptr.2d 506, 968 P.2d 65]; *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161, fn. 3 [69 Cal.Rptr.2d 692].)

But even if we overlook that obstacle, the letter is not persuasive. It only states: "SB 310 also addresses an often-heard park resident complaint that homeowners are not given a price for the proposed converted spaces. This measure would require disclosure of, at least, a non-binding price at the front end of the Subdivided Lands Act process, as a means of providing more information and protection to residents." This excerpt does not support the Association's argument, as the bill author was apparently describing the provisions of Business and Professions Code section 11010.9. Those provisions were, as noted above, also part of Senate Bill No. 310. Thus, we conclude that the reference was to that section, not to section 66427.5.[21]

Accordingly, section 66427.5 does not require disclosure of the tentative purchase price, or the proposed rental prices, at the time of the filing of the tentative map application.

4. *Forced Conversion.*

The Association also contends that El Dorado cannot use section 66427.5 to force a conversion without the consent of a majority of the existing residents. Under this heading, the Association reiterates several of the arguments discussed and rejected above, including its continuing reliance on section 66427.4. The remainder of its argument apparently springs from its contention that section 66427.5 requires the agreement of "66% (or at least 50%) of the existing residents [who] are willing to purchase their lots." The 66 percent argument apparently comes from section 66428.1, while the 50 percent argument apparently springs from the Association's interpretation of Health and Safety Code section 50781, subdivision (m). The latter contention has been rejected above.

Section 66428.1 provides that the requirement for the filing of a tentative map is waived if two-thirds of the owners of mobilehomes in the park

---

[21]Although we do not consider the author's letter for any purpose, it is interesting to note that the author also states that, under the bill, "[l]ocal governments would no longer be able to impose more stringent rent control or other mitigation requirements by construing the conversion as subject to the 'change of use' provisions of the Subdivision Map Act." Since the change of use provision is section 66427.4, this quote supports our conclusion that subdivision (e) of that section was intended to make the section inapplicable to conversions from rental mobilehome parks to resident-owned mobilehome parks.

commit to purchase their units upon conversion. Thus, if there is the requisite consent, there is no need to file a tentative map application at all. The absence of such consent does not mean that no conversion is possible; it only means that the filing requirement is not waived. The owner can still subdivide his property by following the statutory procedures, including the economic displacement mitigation measures specified in section 66427.5. The City agrees: "Without question, mobile home parks can be converted to resident ownership over the objection of the residents (that is what is happening in the case of this park)."

The legislative intent to encourage conversion of mobilehome parks to resident ownership would not be served by a requirement that a conversion could only be made with resident consent. We therefore reject the Association's argument.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with directions to require the City Council to promptly determine the sole issue of whether El Dorado's application for approval of a tentative parcel map complies with section 66427.5. If so, the City Council should approve the application. If not, the City Council should specify the grounds of noncompliance and the trial court should retain jurisdiction to review the issue of compliance in further proceedings.

El Dorado is to recover its costs on appeal.

McKinster, J., and Ward, J., concurred.

The petitions of all respondents for review by the Supreme Court were denied June 26, 2002.